632 So.2d 1239 (1993)
Ronnie Lee CONNER
v.
STATE of Mississippi.
No. 90-DP-927.
Supreme Court of Mississippi.
December 2, 1993.
As Modified on Denial of Rehearing March 17, 1994.
*1243 James W. Craig, Jackson, Tim Wilson, Meridian, Jane Tucker Lambert, Andre de Gruy, Jackson, for appellant.
Michael C. Moore, Atty. Gen., Marvin L. White, Jr., Asst. Atty. Gen., Charlene R. Pierce, Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.
McRAE, Justice, for the Court:
Ronnie Lee Conner was tried in the Circuit Court of Lauderdale County, Mississippi, on a charge of capital murder, and was found guilty. In a separate hearing he was sentenced to death by lethal injection. Finding no reversible error in both the record of Conner's guilt trial and sentence hearing, we affirm his conviction and sentence.

FACTS

The State's Case
About mid-afternoon on New Year's Day of 1990, a group of children spotted a light green car parked beside a dirt road on the outskirts of Meridian, Mississippi. Upon peering inside, they saw an elderly white female slumped over on the passenger side. The woman, with slashed throat, was dead.
One of the children immediately informed his mother who in turn called the police. Emergency personnel arrived on the scene shortly after 3:00 p.m. The body of the victim, later identified as Celeste Brown, was still warm. The police collected several items from the interior of the car including: (1) a four-inch, blood stained knife blade without a handle which was lying on the front floorboard; (2) a brown purse, open, with its contents strewn on the front floorboard; and (3) several shopping bags, one of which contained a receipt from Wal-Mart generated at 1:02 p.m. on New Year's Day, 1990. After talking with Celeste Brown's family, the police learned that the victim was wearing a diamond cluster ring and carrying approximately two hundred dollars in cash on the day of the murder. Both the ring and the cash were missing. Brown was supposed to have picked up a friend at the Meridian Amtrak station around 2:30 p.m.
Dr. Steven Hayne, a pathologist and forensic scientist, conducted an autopsy and concluded that the neck wound, which perforated Brown's jugular vein and entered her oral cavity, caused the death. At trial, Hayne testified that given Brown's posture and the location of the injury, blood would have flowed from the wound at a relatively slow rate. Brown could have lived, in Hayne's opinion, for five to ten minutes after the attack. Hayne further thought that the wounds were inflicted by a small knife with a single edge.
The following day, a black male named Earnest Stevens came to the Meridian Police Headquarters and gave a statement implicating Ronnie Conner in the murder. On the afternoon of January 2, 1990, the police procured a warrant and searched Conner's apartment. They seized as possible evidence a tan corduroy jacket and a multicolored shirt along with an aluminum can and two lengths of pipe which appeared to be crack cocaine paraphernalia.
The jacket, the shirt, and several items taken from Celeste Brown's car were forwarded to the State Crime Lab. The crime lab found no blood on the seized clothing, but a hair of Caucasian origin was recovered from the corduroy coat. The hair was insufficient for comparison purposes. Several fragments of Negroid hair were recovered from the passenger seat of Celeste Brown's car and from the victim's clothing. These fragments were insufficient for comparison purposes.
The spot where Celeste Brown was found dead in her car is about 2.2 miles from the Amtrak station and only a very short distance from Eastern Gardens, an apartment complex where Ronnie Lee Conner lived.
Conner was carried to the police station for questioning immediately following the search. He categorically denied any knowledge of the crime and, according to Officer James Brown, gave an account of his whereabouts *1244 the previous day. Conner stated that he had awakened around 10:00 a.m. on New Year's Day and did not leave his apartment until sometime between 10:00 and 11:00 a.m. He then proceeded to the bus station where he met "Frank." He and Frank went to the Terminal Cafe and sat around drinking wine for about half an hour. Conner stated that upon leaving the Terminal Cafe, he walked to the Davis Court area and from there to the Red Line area where he stayed for about an hour. At some point after lunch, he walked back to Eastern Gardens and slept until after dark. Conner was unable to provide the names of anyone who might have seen him during his excursions.
Frank Blair testified that he encountered Ronnie Conner at the Greyhound bus station on New Year's Day at about 10:00 a.m. He testified that while he and Conner were drinking wine, Conner told him that he needed some money and that "I got to get hold of a little something." Blair responded, "You ain't got to go through all of that, man." According to a written statement taken three days after the murder, Blair also told Conner, "Man, you only have a few more days before you get your check." Blair testified at trial that he could not remember saying anything about a check. Blair further testified that he saw Conner again on January 2 at the Plasma Center. Conner told him, "Man, I got into some shit." According to Blair, Conner appeared nervous.
Earnest Stevens testified that sometime prior to 1:00 p.m. on New Year's Day, Conner came to the Union Hotel where Stevens had been living with Jessie Dubose. At approximately 1:00 p.m., Stevens and Conner left Dubose's apartment. While walking down the stairs, Conner showed Stevens a "blade" which looked like a silver steak knife. While standing in front of the Union Hotel, the two observed "a dude called Snuff" coming up the street. As Snuff approached, Conner told Stevens that he was "fixing to get him up" (meaning Snuff) and see if he had any money. After Snuff had passed, Stevens "talked him out of that" by telling him there "ain't no use in getting in trouble." According to Stevens, Conner then walked down the street toward the Terminal Cafe and Stevens followed a few minutes later. Stevens, Conner, and "Frank" sat in front of the Cafe and talked for about ten or fifteen minutes. Frank then left.
About that time, a light green car pulled up across the street at the Amtrak station, and an old lady got out. According to Stevens, Conner walked across the street and approached the lady. After the two talked for a moment, the lady reached in her purse and gave Conner something. Conner then "put something to her in the back and just made her get off into her car." Conner then climbed into the driver's seat, and drove away.
Another witness for the prosecution was Darryl Barfield, a clerk at Smitty's Grocery, a combination package/grocery store located across the street from Eastern Gardens apartments. Barfield testified that he was working the evening shift in the package store on New Year's Day, 1990. Ronnie Conner came into the package store while it "was still day." Conner showed Barfield a ring and asked him if he thought it was real. According to Barfield, the ring looked real, but it had no carat markings. He told Conner to check with a jewelry store or pawn shop.
Evelyn Cole, also a clerk at Smitty's, agreed that Conner came into the store on the afternoon of January 1, 1990, at "like about three o'clock or three-thirty or somewhere along there or four o'clock." She recalled selling him some beer.
Vicky Gulley, another prosecution witness, testified that on New Year's Day, 1990, she had gone to visit her uncle, Charlie Clark, at Eastern Garden apartments, the same apartment complex where Ronnie Conner lived. At some unspecified point later in the afternoon, she encountered Conner who asked her if she wanted to drink some beer. He had two quarts in a paper bag. She and Conner went inside her uncle's apartment where the three of them sat around drinking the beer for about half an hour. Gulley observed that Conner had blood on his hand, and Conner explained that he had gotten hurt at work. Gulley testified that Conner was wearing a brown corduroy coat but that the coat did not appear to have any blood on it.
*1245 According to Gulley, Conner produced "a gold ring with a diamond on top." He said he had found it at work. Gulley and her uncle teased Conner about the ring not being real. Apparently convinced the ring was a fake, Conner told Gulley that she "could have the ring, because it wasn't going to do him no good if it wasn't real." Gulley also testified that in addition to the ring, Conner was carrying a large amount of cash which included "a hundred dollar bill, a fifty and some twenties."
Gulley further testified that Conner asked her if she wanted to "get high," and that she agreed to do so. Conner told her that he first had to go take a shower and wash up. When asked if there was anything unusual about Conner's appearance other than the blood on his hand, Gulley responded, "He was breathing hard like he was tired or something, I don't know."
After Conner walked over to his own apartment, Gulley left with a "male friend" to go to Davis Court apartments where she hoped to trade the ring Conner had given her for some cocaine. She recalled that it was beginning to get dark when she left Eastern Gardens. Gulley eventually wound up at the Chantiki Club where she sold the ring to Fred Parnell, the club owner, for fifteen dollars.
Gulley used the fifteen dollars to buy a rock of crack cocaine. Afterwards, she returned to Eastern Gardens and went to Conner's apartment. At Conner's apartment she found Conner, Will McNeil, and "Rex, a guy that sells the cocaine." The air was thick with cocaine smoke. According to Gulley, Conner then boasted about committing murder that day.
Q. Now, what happened or what did y'all do when you got to Ronnie's house?
A. I asked Ronnie did he have any more dope left and Ronnie had you [sic] rock left. So, we started smoking rock. So I took a hit.
.....
Q. Now, if you would, tell us what happened then and tell us what Ronnie told you to the best of your recollection in the exact words that Ronnie told it to you.
A. I took a hit off the cocaine and then Ronnie took a hit off the cocaine. He started grinning all of a sudden. I said what is wrong with you? He said, "Guess what, Joe-Joe?" I said, "What?" He said, "I done killed me a mother fucker."
Q. He said what?
A. I done killed me a mother fucker.
Q. Did you ask him what he meant by that?
A. I told him if that is going to make you cheer up like that, you need to leave it alone and stop smoking it.
Q. So, you thought 
A. It was the cocaine making him say that.
Q. You didn't think he was telling the truth at that time?
A. No.
Q. So what happened after that?
A. So, he said, well, I am out to get my revenge because I am tired of sitting around and waiting on people to give me mine, so I am going to start getting mine.
Q. What did he mean by that?
A. I don't know. I guess he was talking about getting whatever he wants.
Q. So, after he told you that, what did you do?
A. He said I done killed one and I don't mind killing another. So, I told him I was fixing to get ready to go.
Q. Did it scare you?
A. It did, and I just told him that I was getting ready to go.
Charlie Clark testified that his niece, Vicky Gulley, had visited his apartment on New Year's Day, 1990. He affirmed that Ronnie Conner had also come, produced a ring, and asked Gulley if it was real. He could not remember what the ring looked like.
The police recovered the ring from Fred Parnell's wife, and the prosecution introduced it as evidence. Both Clarice Williams, Celeste Brown's daughter, and Chuck Sanders, a custom jeweler who made Celeste Brown's ring, identified the ring at trial as the one belonging to Celeste Brown.

*1246 The Defendant's Case

Ronnie Conner relied primarily on an alibi defense. His first witness was Jimmy Evans who lived at the corner of 31st Avenue and Davis Street in Meridian. The witness testified that he saw Conner walk past his house around 10:00 a.m. on January 1, 1990. Evans did not see Conner again that day.
In rebuttal, the prosecution produced witness Renee Watson, an employee at the Plasma Center, who testified that she knew Ronnie Conner because he was a regular donor at the Center. On the morning of January 1, 1990, around 10:00 a.m., she was traveling down Front Street past the Amtrak station and the Terminal Cafe on her way to a funeral. She saw Ronnie Conner standing on the street corner.
T.C. Taylor, Ronnie Conner's uncle, was the defendant's second alibi witness. Taylor testified that he lived at the corner of 11th Street and 32nd Avenue in Meridian. According to his account, Conner came to his house on foot at 1:30 p.m. on January 1, 1990. Taylor was sitting on his front porch. Conner walked up the porch steps, spoke, and then strolled off in the direction of 12th Street.
On cross-examination, Taylor stated that he was seventy-six years old and that his normal daily routine was to sit on his porch most of the day and "look at cars go by and people go by." "If I get sleepy," Taylor stated, "I go in the house and turn the TV on and probably take a nap or fall off to sleep." Examined further concerning how he knew Ronnie Conner had come to his house on January 1, Taylor testified, "I keep up with my calendar, because I get paid on the first and third and that is what I live by." The cross-examination continued as follows:
Q. When you and I talked about this earlier, did you not tell me that that was the day it was supposed to be, that is how you remembered?
A. I really don't remember to call the name of the day, I just don't know.
Q. You don't recall what day it was?
A. I know it was January 1st I seen him.
Q. You told me, prior to this conversation that we are having right now, that you know that because that is the date it was supposed to be; correct?
A. That is right.
Q. Now, why was it suppose [sic] to be that day?
A. No postman comes around on the 1st to bring no mail that day.
Q. The postman came that day?
A. They don't come that day.
Q. That is why it was suppose [sic] to be that day?
A. It didn't just really have to be, but that is the day he come around.
The prosecutor also examined Taylor intensely concerning how he knew Conner had come by at 1:30 in the afternoon:
Q. When did you decide or when did you determine that you had seen him at 1:30?
A. I had my watch on, that is why I know, sir.
.....
Q. After January 1st, when did you first think back to that day and determine that you saw Ronnie on January 1st?
A. I didn't think to [sic] much about it, sir.
.....
Q. That is because it wasn't that unusual an occurrence for your nephew to come by?
A. Like I said, he usually comes by every once in a while, not too often.
Q. You don't know what time he usually comes by?
A. Well, I never kept up about the time. But like I said, this particular day it was 1:30 in the afternoon.
Q. What, may I ask, prompted you to keep up with the time on this particular day when you don't on any other day?
A. I really don't know, sir.
Taylor also testified that he knew Conner came by at about 1:30 p.m. because he had been watching "The Price is Right" and Bob Barker on television immediately before Taylor went out to the porch on the morning of January 1, 1990.
*1247 As a rebuttal witness, the prosecution called Dawn Walker, program director for WTZH-TV in Meridian. Walker testified that "The Price is Right" and Bob Barker did not air on January 1, 1990. Instead, the station ran two CBS specials: the Cotton Bowl Parade and the Tournament of Roses Parade.
James Perkins, the owner of Perkins' Grocery and Pool Hall on the corner of 12th Street and 31st Avenue, testified that he saw Ronnie Conner sitting in the pool hall section of his establishment between 12:00 and 12:30 p.m. on January 1, 1992, with Dorothy Neal, another customer. Perkins saw Conner coming in and out of the store on five other occasions throughout the day. He last saw Conner at about 5:00 p.m. Perkins explained that his store is located about thirteen blocks from the Amtrak station.
Dorothy Neal testified that she was Conner's sister-in-law. On January 1, 1990, Neal was with Conner at Perkins' Grocery from between 12:00 noon and 1:00 p.m. until almost 4:00 p.m. She was keenly aware of the time because she had to be somewhere at 4:00 and was keeping her eye on the clock. Neal's cousin Michael Helen arrived at about 2:30, and the three of them sat around talking until about 3:15, when Helen left. On cross-examination, Neal acknowledged that she saw Conner's mother every day, but stated that they had talked about the murder charge only "two or three times at the most."
Michael Helen testified he arrived at Perkins' Grocery at about 2:00 or 2:30 p.m. on January 1, 1990. He remembers it was New Year's Day because he did not work that day. He saw Conner and Dorothy Neal sitting at a table in the pool hall and joined them for a beer. On cross-examination, Helen stated that he was a regular customer at Perkins', going there on an average of five days a week. He knew he arrived at Perkins' at 2:30 on January 1, 1990 because, "I have a watch on my arm and I am always looking at my watch." Helen could not remember when he left Perkins' on January 1, and he could not remember whether he left on foot or by car. He stated that he and Neal had never discussed what happened on January 1, 1990, but he acknowledged that he had spoken to Conner's family prior to giving a statement. He could not recall what he had done on Christmas Day, 1989.
Robert Brown testified that he lived with T.C. Taylor, the uncle who allegedly saw Conner at 1:30 on his front porch. Brown spent most of January 1 sitting in his bedroom listening to music. Around 4:30 p.m., Conner came by, went into Brown's bedroom, and left a bag of nails for "Pooky," Taylor's son. On cross-examination, Brown stated that he had no clock in his room and did not own a watch. He knew what time Conner came by, however, "Because I always go in Taylor's room and check the time." Brown testified that someone else had come by that day and had drunk beer with him in his room, but he could not remember who it was. Brown acknowledged that the first time he mentioned Conner's January 1 visit to anyone was seven months later, about a week before trial. During the period around January 1, 1990, Brown was unemployed and stayed home in his room most of every day; he could think of nothing that would have impressed January 1, 1990, upon his memory more than any other day.
After hearing all the evidence, the jury retired and found Conner guilty of capital murder.

GUILT PHASE

I.

DID THE TRIAL COURT ERR IN NOT ORDERING A COMPETENCY HEARING?
Conner insists that, although he did not request a competency hearing at or before trial, the trial court had reasonable grounds to believe that the defendant was mentally incapable of standing trial and should have ordered a competency hearing sua sponte. Rule 4.08(1) of the Uniform Criminal Rules of Circuit Court Practice provides:
Inability to Stand Trial. If before or during trial the court, of its own motion or upon motion of counsel, has reasonable grounds to believe that the defendant is insane, the court shall order the defendant to submit to a mental examination by some *1248 competent psychiatrist selected by the court in accordance with Miss. Code Ann. § 99-13-11 (1972).
The State argues that, since Conner failed to request a competency hearing below, his claim is procedurally barred. This argument is defeated by both the case law and the explicit language of Rule 4.08(1). Rule 4.08(1) disjunctively states that a competency hearing may occur upon motion of counsel or upon the court's own motion. Further, the United States Supreme Court in Pate v. Robinson, 383 U.S. 375, 384, 86 S.Ct. 836, 841, 15 L.Ed.2d 815 (1966), held that "it is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently `waive' his right to have the court determine his capacity to stand trial." Pate, 383 U.S. at 384, 86 S.Ct. at 841. See also Gothard v. State, 452 So.2d 889, 893 (Ala.Ct.Crim.App. 1984) ("Even where the issue of competency to stand trial has not been raised by defense counsel, the trial judge has an ongoing and continuing responsibility to prevent the trial of an accused unable to assist in his defense").
The real question, therefore, is whether "reasonable grounds" existed to believe that Conner was insane. If so, then Rule 4.08 mandates a competency hearing. The determination of what is "reasonable," of course, rests largely within the discretion of the trial judge. He sees the evidence first hand; he observes the demeanor and behavior of the defendant.
For purposes of reviewing a decision to forego a competency hearing, the Fifth Circuit Court of Appeals has suggested the following test: Did the trial judge receive information which, objectively considered, should reasonably have raised a doubt about defendant's competence and alerted him to the possibility that the defendant could neither understand the proceedings, appreciate their significance, nor rationally aid his attorney in his defense? Lokos v. Capps, 625 F.2d 1258, 1261 (5th Cir.1980). The United States Supreme Court in Drope v. Missouri, 420 U.S. 162, 180, 95 S.Ct. 896, 903, 43 L.Ed.2d 103, 118 (1975), indicated that "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required."
In trying to show that he was entitled to a competency hearing, Conner relies on a set of five criteria which, according to the American Bar Association, collectively define a competent defendant as one: (1) who is able to perceive and understand the nature of the proceedings; (2) who is able to rationally communicate with his attorney about the case; (3) who is able to recall relevant facts; (4) who is able to testify in his own defense if appropriate; and (5) whose ability to satisfy the foregoing criteria is commensurate with the severity and complexity of the case.[1] *1249 Conner insists that he does not meet factors two through five. To support his claim, he gleans the following from the record:
(1) Conner takes medication for schizophrenia;
(2) He made a suicide "gesture" and allegedly "hears voices;" a "voice" once prompted him to jump off a moving train;
(3) Records from the Weems Community Health Center indicate that Conner functions at a "low average" intellectual level and that he is considered incompetent to manage his finances;
(4) At a pretrial hearing, defense counsel complained, "A lot of these things I am having a great deal of difficulty getting because Ronnie does have a mental problem and he is not able to assist me as to where to go and look for things and ask for things;"
(5) When the court asked Conner whether he understood he had a right to testify, Conner responded affirmatively but insisted, "I'm in no shape to testify;" and
(6) On cross-examination, Conner recalled virtually no facts concerning the case; could not relate the ages or birthdays of his family members; the substance of his January 2, 1990, statement; how long he had known his defense attorney; and responses he had made to questions a few minutes before on direct examination. The following exchange is characteristic of Conner's performance on cross-examination:
Q. My question is, do you remember anything that happened on January 1, 1990?
A. All I can remember is that I was at home.
Q. You were at home all day?
A. I don't even know.
Q. You don't even know?
A. No, sir.
Q. Do you remember whether or not you took  how often you took medication?
A. How often?
Q. Yes.
A. Every day and night.
Q. You take medication twice a day?
A. Twice a day, I was taking it three times a day.
Q. January 1, 1990, were you taking your medication twice or three times a day?
A. I was on medication.
Q. Were you taking it twice or three times a day?
A. I don't know.
Q. Did you take your medication on January 1, 1990?
A. I believe I did.
Q. Do you remember taking it?
A. No, but I believe I took it.
Q. But you weren't in your right mind?
A. I didn't say that either.
Q. You didn't just tell Mr. Wilson that on the first day of January, 1990, that you didn't know where you were, you weren't in your right mind?
A. I don't know, man.
Q. You don't know what you just told Mr. Wilson?
A. Did I tell him?
Q. Yes, sir.
A. I don't even remember that.
Q. You don't remember what happened five minutes ago, telling Mr. Wilson that you weren't in your right mind on January 1st?
A. No, sir.
Q. Is your memory that bad, Mr. Conner?
A. Yes, it is.
Q. You can't remember what happened five minutes ago?
A. No, sir.
Q. Has your memory always been that bad?
A. Yes.
Q. It has?
A. Yes. It comes and goes.
*1250 Conner's memory appears to have served him much better on direct examination:
Q. Ronnie, would you please identify yourself to the Jury?
A. My name is Ronnie Lee Conner.
Q. How old are you, Ronnie?
A. Thirty-one years old.
Q. Where did you reside before you were incarcerated?
A. Where did I live?
Q. Where did you live before you went to jail?
A. I lived with my mother and them, I think.
Q. Who is your mother?
A. Mrs. Ida Lee Conner.
Q. How old is she?
A. I don't know.
Q. Who is your father?
A. Tilton Conner.
Q. How old is he?
A. I don't know.
Q. How many brothers and sisters do you have?
A. Four brothers and five sisters.
Q. In the ten children that you described, where do you fall in the sequence? You are the first child or second child or 
A. I'm the forth.
Q. Fourth child?
A. Yes.
Q. How do you support yourself?
A. Well, I was receiving social security benefits and also I did odd jobs.
Q. How much  why did you receive social security benefits?
A. Because of my mental illness.
.....
Q. Have you ever been hospitalized for this?
A. Just treatment at Weems. I was hospitalized in job corps.
Q. Do you take any prescription medications?
A. Yes.
Q. Can you tell me what medication that you take?
A. Stellazine, cogentin and they took me off of my desaprin [sic].
.....
Q. Have you worked in many jobs in the past couple of years?
A. Yes, just odd and end jobs. I work for a man by the name of Mr. Townsend that live in Collinsville. We were working over here next to Highway Village working on a house, remodeling houses.
.....
Q. When you lived alone, did you prepare your own meals?
A. Sometimes.
Q. When you did not prepare you own meals, who prepared them?
A. My mother and sisters come over and cook for me sometimes. Also, I had a girlfriend who would cook for me.
Q. Do you handle your own financial affairs?
A. Not all the time.
Q. Who handles your financial affairs for you?
A. My mother.
.....
Q. Describe for me how she handles your financial affairs.
A. She goes and buys clothes for me. The clothes I got on now she bought for me. She would go to the grocery store and buy me groceries and stuff like that.
Q. Does she pay your rent?
A. Sometimes.
Q. Other sometimes, how was it paid?
A. By me.
Q. Who gives you the money to pay the rent?
A. My mother.
Q. Where does she get the money to give you?
A. From the social security.
Q. How are the social security checks made payable?
A. How are they made payable?
Q. Yes, sir.
A. My mother is the overseer of my check.

*1251 Q. I'm sorry, say that again.
A. My mama is the overseer of my disability check.
Q. Are your checks payable to Ida Lee Conner?
A. Yes.
Before the defense rested in the trial on guilt or innocence, the trial judge thoroughly examined Conner concerning whether his decision not to testify in his own defense was voluntary and intelligent. Judging from the transcript, Conner was lucid and engaged in the exchange. He responded positively to each of the judge's question, once asking the judge to repeat a statement he did not understand; he stated that he and his attorney had discussed whether it would be in his best interests to testify; he indicated that he was satisfied with the services of his attorney.
About a month after his arrest, the trial court ordered that Conner be admitted to the state mental hospital for an evaluation of his competency to stand trial. In a May 3, 1990, letter to the trial judge, the hospital reported:
Mr. Conner is a thirty year old man admitted 3/21/90 by order of your court. He is charged with capital murder in a crime occurring 1/1/90. He was sent to this hospital for evaluation of his competency to stand trial and sanity at the time of the crime.
While he [Conner] has been here, he has been under close observation and has had medical and psychological workup. His case was reviewed this morning in a formal staff conference and he was interviewed at length by Dr. McMichael, consulting staff psychiatrist. Mr. Conner was able to describe the charge against him in a relevant manner and he knew the possible consequences of conviction. He had a good understanding of the basic proceedings he might face in court, including the roles of various participants in court and the behavior expected of him in the courtroom. He described the time period surrounding the crime and he showed no impairment in his memory for that period. He denied commission of the crime but was aware of the evidence that would be used against him in his case.
The staff was unanimous in the opinion that he is competent to stand trial at the present time. He appears to have a rational as well as factual understanding of the charges against him and he appears capable of assisting his attorney in preparing a defense. With regard to his sanity at the time of the crime, the staff was unanimous in the opinion that he knew the difference between right and wrong in relation to his actions.
Mr. Conner has been treated at the Mental Health Center for a number of years and has a Schizophrenic diagnosis. We have retained this diagnosis, although he has shown few if any of the symptoms of this disorder during his stay in the hospital. He is on medication and this could account for the lack of symptoms. We have given him a diagnosis of Personality Disorder Not Otherwise Specified to reflect a longstanding pattern of social discomfort, excessive dependency, and a tendency to take out his anger in indirect and passive ways.
During his stay, he exhibited one suicide gesture. He has expressed the thought that his life is not worth living, but says that he has felt this way since high school. At any rate, it would be advisable to watch him closely in the county jail, since he may at some point make another suicide gesture.
The Court must assume that the trial court objectively considered all the facts and circumstances, including those which are not available to this Court, which bore upon Conner's competence to stand trial. There is nothing in the record which, considered in context, leads inexorably to the conclusion that Conner "could neither understand the proceedings or appreciate their significance, nor rationally aid his attorney in his defense." The trial court did not manifestly err in not ordering a competency hearing.

II.

WAS THE EVIDENCE LEGALLY SUFFICIENT TO ESTABLISH RONNIE CONNER'S GUILT OF CAPITAL MURDER?
Conner argues on appeal that the state failed to put on sufficient evidence to *1252 prove the charge of capital murder with its component offenses of murder, kidnapping, and robbery. Given the abundance of evidence in the record, this argument is clearly specious. Earnest Stevens testified as an eyewitness to the kidnapping. Vicky Gulley testified that Conner had Celeste Brown's ring and a large amount of cash in his possession soon after the murder and robbery occurred. Gulley also repeated Conner's boast about having killed someone.
In addition to the eyewitness accounts of Stevens and Gulley, the record is replete with circumstantial evidence, much of which tends to corroborate the testimony of Stevens and Gulley. Several witnesses, including Celeste Brown's daughter and the jeweler who made Celeste Brown's ring, confirmed that the ring Gulley sold at the Chantiki Club belonged to Celeste Brown. Frank Blair confirmed that Conner was in the vicinity of the Amtrak station near noon on the day of the murder and testified that Conner appeared nervous the next day and told him that he had "got into some shit." Darryl Barfield, a clerk at the package store across from Eastern Gardens, testified that Conner showed him Celeste Brown's ring the day of the murder. Conner, according to Evelyn Cole's testimony, purchased beer from Smitty's Grocery during the afternoon following the crime. Since Gulley testified that Conner had two quarts of beer when she met him near Smitty's, Evelyn Cole's story helps to substantiate Vicky Gulley's account. Other evidence which serves to corroborate Vicky Gulley's story includes the fact that the police found the coat Conner was wearing on January 1 hanging on a shower rod the next day. Gulley testified that Conner went home to shower after giving her the ring. The seizure of crack cocaine paraphernalia in Conner's apartment the day after the murder lends credence to Gulley's testimony statement that Conner and others were smoking cocaine in Conner's apartment when he told her about committing the murder. Other evidence tending to tie Conner to the crimes include the Caucasian hair found on his coat and the bloody knife blade found in Celeste Brown's car which could fit the description of the knife Earnest Stevens saw on Conner's person shortly before the murder.
A conviction can stand only if the record contains sufficient evidence to establish the elements of the charge. Fisher v. State, 481 So.2d 203, 212 (Miss. 1985). Conner points out that the State's case rests principally upon the testimony of Earnest Stevens and Vicky Gulley. The testimony of these witnesses is insufficient to support a conviction, Conner insists, because Stevens' testimony "lacks any credibility" and Gulley's testimony supplies "no direct evidence" of robbery.
Conner's argument is without merit. It is axiomatic that the jury is the sole judge of credibility, [Jowers v. State, 593 So.2d 46, 47 (Miss. 1992); Dixon v. State, 519 So.2d 1226, 1228 (Miss. 1988)] and the jury in this case apparently believed the testimony of Earnest Stevens. Further, direct evidence is unnecessary to support a conviction so long as sufficient circumstantial evidence exists to establish guilt beyond a reasonable doubt. Fleming v. State, 604 So.2d 280, 288-289 (Miss. 1992); Tolbert v. State, 407 So.2d 815, 820 (Miss. 1981).
The evidence contained in the record, both direct and circumstantial, is sufficient to support Conner's conviction of capital murder.

III.

DOES THE TRIAL COURT'S USE OF DISJUNCTIVE LANGUAGE IN THE CAPITAL MURDER JURY INSTRUCTION REQUIRE REVERSAL?
The Mississippi Code defines "capital murder" as "[t]he killing of a human being ... by any person engaged in the commission of the crime of rape, burglary, kidnapping, arson, [or] robbery...." Miss. Code Ann. § 97-3-19 (1984 amendment). Ronnie Conner was charged with killing while engaged in the commission of the crimes of kidnapping and robbery. Jury Instruction S-1, however, told the jury that they should find the defendant guilty of capital murder if it found that he killed Celeste Brown while committing the crimes of kidnapping "or" robbery. This instruction, Conner contends, permitted the jury to return a less-than-unanimous verdict finding him guilty of capital murder. The *1253 defense contended, theoretically, that some members of the jury could have found him guilty of kidnapping but not guilty of robbery, while other members could find him guilty of robbery but not guilty of kidnapping. The net result could be a capital murder verdict lacking unanimity. Miss. Const. art. III, § 31 (1890) guarantees that a criminal defendant can be convicted only upon a unanimous verdict by twelve jurors. See Markham v. State, 209 Miss. 135, 46 So.2d 88 (1950) (criminal defendant entitled to unanimous jury as part of his constitutional right to trial by jury).
The State argues that Conner waived any error arising out of Instruction S-1 by failing to object to it at trial. The State further notes that Conner's own proposed instructions D-1 and D-2, both refused, contained the same disjunctive language. This Court has often stated that a party is barred from appealing on grounds of a jury instruction to which he made no contemporaneous objection below, even in a death penalty case. Hansen v. State, 592 So.2d 114, 142 (Miss. 1991), cert. denied, ___ U.S. ___, 112 S.Ct. 1970, 118 L.Ed.2d 570 (1992); Cole v. State, 525 So.2d 365, 371 (Miss. 1987), cert. denied, 488 U.S. 934, 109 S.Ct. 330, 102 L.Ed.2d 348 (1988); Lockett v. State, 517 So.2d 1317 (Miss. 1987), cert. denied, 487 U.S. 1210, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988); Stringer v. State, 500 So.2d 928 (Miss. 1986). It has been held, however, albeit long ago, that a defendant cannot waive his right to a twelve-member jury. See Hunt v. State, 61 Miss. 577, 580 (1884), overruled on other grounds, Arbuckle v. State, 80 Miss. 15, 20, 31 So. 437 (1901).
Even if Conner retained his right to contest Instruction S-1, despite his failure to raise the issue until appealing, the defective instruction does not require reversal. The jury's sentencing verdict clearly finds that Conner was engaged in committing the crimes of both kidnapping and robbery when he killed Celeste Brown. Any error involving concern over whether the jury's guilty verdict was unanimous thus stands cured. See B-W Acceptance Corp. v. Porter, 568 F.2d 1179 (5th Cir.1978) (error resulting from misleading instruction cured where verdict indicates that jury was not misled). In response to this proposition, Conner notes that in his closing argument in the sentencing trial, the prosecutor stated that the previous day's guilty verdict included a finding that Conner was guilty of both kidnapping and robbery. Consequently, Conner reasons, the language in the sentencing verdict may reflect the prosecutor's argument, not an actual unanimous finding that Conner was guilty of both kidnapping and robbery. Conner's argument has no merit. The trial court instructed the jury concerning the possible aggravating circumstances, including the contemporaneous commission of kidnapping and robbery, and explicitly informed the jury that
You must unanimously find, beyond a reasonable doubt, that one or more of the preceding aggravating circumstances exist in this case to return the death penalty. If none of these aggravating circumstances are found to exist, the death penalty may not be imposed.
(emphasis added). Having received this instruction, the jury could not reasonably have assumed that Conner's guilt of kidnapping and robbery was a settled and foregone conclusion unless the jury had unanimously found Conner guilty of these crimes in reaching its previous verdict.
Further, we note that all three crimes of which Conner is accused occurred as part of a single transaction and are essentially inseparable. Given the facts and circumstances of this case, it is highly unlikely that any reasonable juror could have found Conner guilty of one crime but not the others. As such, the error, if any, is harmless. See Davis v. State, 204 So.2d 270 (Miss. 1967), rev'd on other grounds, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); Lancaster v. State, 200 So. 721 (Miss. 1941).

IV.

WAS CONNER ENTITLED TO A LESSER INCLUDED OFFENSE INSTRUCTION?
Conner contends that the jury should have been instructed concerning the lesser-included offense of simple murder. In *1254 McGowan v. State, 541 So.2d 1027, 1028 (Miss. 1989), we ruled that
[a] lesser-included offense instruction should be granted unless the trial judge and ultimately this Court can say, taking the evidence in the light most favorable to the accused and considering all the reasonable inferences which may be drawn in favor of the accused from the evidence, that no reasonable jury could find the defendant guilty of a lesser-included offense (conversely, not guilty of at least one essential element of the principal charge).
In Welch v. State, 566 So.2d 680, 684 (Miss. 1990), we again stated:
Defendants are entitled to have instructions on their theory of the case presented to the jury for which there is foundation in evidence, even though the evidence might be weak, insufficient, inconsistent, or of doubtful credibility.
As these precedents illustrate, Mississippi law strongly favors the granting of lesser-included offense instructions. However, the trial court's failure to grant one in the instant case does not constitute reversible error for two reasons: (1) Conner never requested a lesser-included offense instruction and failed to object to the Court's failure to give one, and (2) the record contains no evidentiary foundation to support such an instruction.
In Hansen v. State, 592 So.2d 114, 141-42 (Miss. 1991), cert. denied, ___ U.S. ___, 112 S.Ct. 1970, 118 L.Ed.2d 570 (1992), the Court held that where a trial court fails to grant a non-capital murder instruction in a capital murder case, the defendant is barred from raising the issue on appeal unless he requested such an instruction in the lower court. Conner argues that his proposed form-of-verdict instruction (No. D-5), represents an "inartful" attempt at a lesser-included offense instruction which the trial court should have reshaped into a valid instruction. Mease v. State, 539 So.2d 1324, 1335 (Miss. 1989), holds that where "a disputed instruction relates to a central feature of the case and where there is no other instruction before the court which treats the matter," the trial court is obliged to reform the instruction if it is merely "deficient in form." Accord Harper v. State, 478 So.2d 1017, 1022-23 (Miss. 1985). Instruction D-5, which the trial court refused, stated:
The Court instructs the Jury as follows:
1. Should you find Ronnie Conner not guilty of capital murder or murder, then the form of your verdict shall be:
"We, the Jury, find Ronnie Conner not guilty."
2. Should you find Ronnie Conner guilty of murder, then the form of your verdict shall be:
"We, the Jury, find Ronnie Conner guilty of murder."
3. Should you find Ronnie Conner guilty of capital murder, then the form of your verdict shall be:
"We, the Jury, find Ronnie Conner guilty of capital murder."
The defense tendered no instruction defining simple murder, nor did it ask the trial court to explain to the jury that it could convict the defendant of a lesser crime than capital murder. Conner argues that under Mease and Harper, the trial court is duty-bound not only to revise technically flawed instructions but also to advise defense counsel that a definitional instruction would also have to be submitted and then provide an opportunity to prepare such an instruction. Mease and Harper should not be read so broadly. The case law does not impose upon a trial court a duty to instruct the jury sua sponte, nor is a court required to suggest instructions in addition to those which the parties tender. Conner offered no substantive instruction pertaining to a lesser-included offense, and "the fact that ... [he] requested no lesser included instruction controls." Hansen, 592 So.2d at 142.
Even if Mease and Harper were applicable here, Conner waived any resulting error by failing to raise a pertinent objection to Instruction S-12-A, the State's form-of-verdict instruction which the trial court accepted in lieu of defense Instruction D-5. Instruction S-12-A states:
The Court instructs the Jury that your verdict shall be returned to the Court in one of the following forms:

*1255 1. Should you find the Defendant, Ronnie Lee Conner, guilty of Capital Murder, then the form of your verdict shall be:
"We, the Jury, find the Defendant, Ronnie Lee Conner, guilty of Capital Murder."
2. Should you find the Defendant, Ronnie Lee Conner, not guilty of Capital Murder, then the form of your verdict shall be:
"We, the Jury, find the Defendant, Ronnie Lee Conner, not guilty."
The defense objected to this instruction, but not on grounds that it did not envision a verdict finding Conner guilty of a lesser-included offense. The transcript reflects the following exchange between defense counsel and the judge:
BY THE COURT: S-11 will be given. What says the Defendant with respect to S-12-A?
BY MR. WILSON: We object to S-12-A for the reason that the options are listed, we feel, in the wrong order. We feel like the presumption of innocence, that the option of finding the Defendant not guilty should be listed first.
BY THE COURT: S-12-A is nothing more than the form of the verdict. Your objection is noted for the record. It will be overruled. S-12-A will be given.
BY MR. WILSON: Yes, sir.
An objection on one or more specific grounds constitutes a waiver of all other grounds. Stringer v. State, 279 So.2d 156, 158 (Miss. 1973); see McGarrh v. State, 249 Miss. 247, 276, 148 So.2d 494, 506 (1963) (objection cannot be enlarged in reviewing court to embrace omission not complained of at trial), cert. denied, 375 U.S. 816, 84 S.Ct. 50, 11 L.Ed.2d 51 (1963). Since Conner failed to object to the State's form-of-verdict instruction on grounds that it was incomplete, he is procedurally barred from raising the point here.
In any event, the evidence in the record does not support Conner's assertion that he was entitled to a lesser-included offense instruction. The evidence of the three component crimes in the capital murder charge are so intertwined as to be virtually inseparable. For example, Earnest Stevens' testimony which accused Conner of forcing the "old lady" into the "green car" at knife point and driving away supports not only the kidnapping charge but also, by inference, the murder charge. Likewise, the testimony of witnesses who reported seeing Celeste Brown's ring and large quantities of cash in Conner's possession immediately following the murder support both the robbery and murder charges. If the jury had believed that someone other than Conner abducted Celeste Brown and stole her property, then it is difficult to conceive how a reasonable jury could have believed that Conner committed the murder. Given these circumstances, the trial court would have been justified in refusing a lesser-included offense instruction under McGowan.
Moreover, Instruction S-1 informed the jury that they could find Conner guilty of capital murder only if they found Conner to be guilty beyond a reasonable doubt of every element in the charge. The instruction specified as one of the required elements:
that the Defendant, Ronnie Lee Conner, did ... wilfully, unlawfully and feloniously and without authority of law ... kill and murder Celeste Brown.
Thus, even if the trial court erred in failing to give a lesser-included offense instruction, the error was cured by the jury's verdict which by necessary implication finds Conner guilty of simple murder. See Toliver v. State, 600 So.2d 186, 191 (Miss. 1992) (issue of lesser-included offense instruction becomes moot when jury verdict, in finding defendant guilty of greater offense, finds him guilty of elements which constitute lesser offense).

V.

DID THE TRIAL COURT ERR IN DENYING THE PROPOSED DEFENSE INSTRUCTION ON THE QUANTUM OF PROOF AT THE FIRST PHASE OF THE TRIAL?
In determining whether a circumstantial evidence instruction should be given, we have stated the following:
It is the law in this state that, where the evidence for the prosecution is wholly circumstantial in nature, the accused is entitled upon request to have the jury instructed *1256 that, before they may convict, they must find that each element of the offense has been established beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence... . [T]he instruction must be given only where the prosecution is without a confession and wholly without eyewitnesses to the gravamen of the offense charged.
Keys v. State, 478 So.2d 266, 267 (Miss. 1985). Relying upon this principle, Conner sought to offer jury instruction D-2 which states:
The Court instructs the Jury as follows:
1. If you find from the evidence that reasonable doubt exists of any one of the following elements, to the exclusion of any other reasonable hypothesis consistent with innocence, then you shall find Ronnie Conner not guilty of Capital Murder:
a. That Ronnie Conner did, on January 1, 1990, in Lauderdale County, Mississippi, willfully, unlawfully, and feloniously and without authority of law, and with malice aforethought kill and murder Celeste Brown, and;
b. While he was engaged in the commission of the crime of Robbery or Kidnapping.
2. If the State of Mississippi has proved each and every one of these elements beyond a reasonable doubt, and to the exclusion of every other reasonable hypothesis consistent with innocence, then you shall find Ronnie Conner guilty of Capital Murder.
The trial court refused the instruction on grounds that the Earnest Stevens' eyewitness account constituted direct evidence in support of the prosecution's charge.
According to Conner, Earnest Stevens' testimony does not count. He cites McNeal v. State, 551 So.2d 151, 158-59 (Miss. 1989), wherein this Court questioned in dicta whether the account of a jail-house informant "should be considered as direct evidence which would prevent the granting of a circumstantial evidence instruction." In McNeal, a prisoner testified against the defendant in exchange for a reduced sentence. The Court observed that under such circumstances, the testimony was potentially unreliable.
Conner emphasizes that Earnest Stevens was confined to the municipal jail on a contempt charge at the time of Conner's trial. Stevens was not, however, a "jailhouse informant." When he first gave a statement and became a witness in the case on January 2, 1990, he was a free man. Nothing in the record suggests that Stevens testified in exchange for some favor. McNeal is thus inapplicable. Further, Stevens' testimony is not the only direct evidence linking Conner to the crime. There is also Conner's admission to Vicky Gulley that he had killed someone. In Mack v. State, 481 So.2d 793, 795 (Miss. 1985), the Court stated:
There is no reason on principle why an admission by the defendant on a significant element of the offense should not also operate to render unnecessary the circumstantial evidence instruction.
While Conner did not expressly identify Celeste Brown to Vicky Gulley, his statement nevertheless qualifies as direct evidence. According to Mack, "an admission ... [is] a statement by the accused  it may be direct or implied  of facts pertinent to the issue and tending in connection with other facts to prove his guilt." Mack, 481 So.2d at 795 (citing Reed v. State, 229 Miss. 440, 91 So.2d 269 (1956). The direct evidence in the record now before the Court, consisting principally of Stevens' eyewitness testimony and Gulley's repetition of Conner's admission, obviates the need for Conner's circumstantial evidence instruction.
Conner argues alternatively that the trial court should have granted Instruction D-2 on grounds that it "contained language essential to the definition of the `beyond a reasonable doubt' standard applicable to all cases, direct or circumstantial." He cites Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), for the proposition that the failure to properly instruct the jury on the definition of "beyond a reasonable doubt" offends the Sixth and Fourteenth Amendments to the United States Constitution.
*1257 This argument is specious. First, there is nothing in Instruction D-2, previously quoted in full, which defines the term "beyond a reasonable doubt." Secondly, Instruction C-7 fully explains the manner in which the jury should apply the reasonable-doubt standard to the evidence:
The Court instructs the jury that a reasonable doubt of guilt may arise either from the evidence or the lack of evidence or a conflict of evidence, and if, upon consideration of all the evidence in this case, or the lack of it or the conflict of it, such reasonable doubt does exist, then it is your sworn duty as Jurors to return a verdict of Not Guilty.
The assignment of error is meritless.

VI.

DID THE PROSECUTOR'S REFERENCES TO A POLYGRAPH IMPERMISSIBLY BOLSTER EARNEST STEVENS' TESTIMONY?
When Earnest Stevens gave his January 2, 1990, statement, he agreed to take a polygraph test. The record does not disclose whether he ever took the test or, if so, what the result was. At trial, the prosecutor made two references to Stevens' willingness to take the test. The first occurred during the direct examination of Detective James Brown.
Q. Was Earnest Stevens, the statement that he gave you, did y'all just take him for telling the gospel truth at that time or did you ask him any further questions?
A. As I stated, we obtained his proper identification of who he was and verified that and verified other information that he had given us in his statement, such as Mr. Conner living in Eastern Gardens. We determined that his apartment was B-38. We verified what information we could that Mr. Stevens had given us.
Q. What, if anything, did y'all ask Earnest Stevens to do for you?
A. Nothing, just to give us a statement of what he observed.
Q. What, if any, other efforts did you make to determine whether or not he was telling the truth?
A. We asked that he submit to a polygraph examination.
BY MR. WILSON: Your Honor, I object.
BY THE COURT: On what grounds?
What is the basis of your objection?
BY MR. WILSON: Not relevant.
BY THE COURT: Overruled.
Q. Did Earnest Stevens refuse to take a polygraph?
A. No, sir. He agreed to take one.
Later, during closing arguments, the prosecution stated: "Earnest Stevens was confident. He agreed to take a lie detector test and voluntarily came to Al Brown." Conner maintains that by putting on evidence that Earnest Stevens agreed to take a polygraph test, the prosecution impermissibly bolstered the testimony of its star witness and unfairly prejudiced the defense.
This Court has often held that neither the results of a lie detector test nor the fact that one was taken is admissible as evidence, and that the introduction of such evidence constitutes reversible error. See Pennington v. State, 437 So.2d 37, 40 (Miss. 1983); Jordan v. State, 365 So.2d 1198 (Miss. 1978), cert. denied, 444 U.S. 885, 100 S.Ct. 175, 62 L.Ed.2d 114 (1979); Mattox v. State, 240 Miss. 544, 128 So.2d 368 (1961). However, where the focus is not on the exam itself but instead on one's willingness or reluctance to submit to a polygraph exam, the Court has arrived at a different conclusion.
In Stringer v. State, 454 So.2d 468 (Miss. 1984), cert. denied, 469 U.S. 1230, 105 S.Ct. 1231, 84 L.Ed.2d 368 (1985), we held that
the mere mention of the failure to submit to an examination could not be reversible error under the record in this case. It was inconsequential in the case compared with all the other evidence placed before the jury. Further bolstering of this opinion is that we are not dealing with the attempted introduction of the results of a polygraph examination, only the refusal to take one for whatever reason. ...
Stringer, 454 So.2d at 474-75; see also Garrett v. State, 549 So.2d 1325, 1330-31 (Miss. 1989) (where document disclosing defendant's willingness to take lie detector test was inadvertently *1258 delivered to jury, Court ruled that, under Stringer, no reversible error occurred).
It is of course the rule in virtually all jurisdictions that a witness's unimpeached or unquestioned credibility may not be bolstered by any means, including references to polygraphic evidence. See, e.g., Tiner v. State, 214 Miss. 551, 59 So.2d 287 (1952) (testimony supporting veracity of witness is inadmissible where veracity of witness has not been assailed); Sparks v. State, 820 S.W.2d 924, 929 (Tex. Ct. App. 1991) (prosecution impermissibly bolstered witness's testimony by asking, "Did you agree to take a polygraph examination?" where only purpose of question was to add credence to witness's earlier, unimpeached testimony); United States v. Vigliatura, 878 F.2d 1346, 1349 (11th Cir.1989) ("a witness's or defendant's willingness to submit to a polygraph examination is inadmissible to prevent bolstering of credibility").
Subject to certain limitations, however, a party is permitted to introduce evidence supporting the truthfulness of his witness once the witness's veracity has been attacked. See M.R.E. Rule 608. A growing contingent of courts, particularly those in the federal realm, have concluded that polygraphic evidence is acceptable for such purposes, particularly where the evidence consists merely of a witness's willingness to submit to a polygraph exam. See, e.g., Underwood v. Colonial Penn Ins. Co., 888 F.2d 588 (8th Cir.1989); United States v. Miller, 874 F.2d 1255, 1261-62 (9th Cir.1989); United States v. Piccinonna, 885 F.2d 1529, 1535 (11th Cir.1989). Many such decisions adopt the rationale that where polygraphic evidence is used for the non-substantive purpose of restoring the credibility of an impeached witness, the traditional reasons for eschewing such evidence lose force. As one writer explained in Brennan, Mark, Reexamining Polygraph Admissibility: United States v. Piccinonna Underwood, 56 Mo. L.Rev. 143, 161 (1991):
When polygraph evidence is offered for non-substantive purposes, the traditional objections to polygraph admissibility become irrelevant or are greatly reduced. Where the results of the test are not admitted, there can be no challenge to their validity or to the reliability of polygraph testing in general. Similarly, the results cannot be attacked through the insufficiency of the procedures used in the exam or the lack of procedural standardization in polygraph testing. In addition, if the results of the exam are not admitted for their substantive value, but for some other reason, the courts may avoid the question of who is qualified as a polygraph expert. The third traditional objection to polygraph admissibility, undue influence upon the jury, retains some of its force even where the evidence is offered for a non-substantive purpose. A jury may still draw too great an inference from the fact that a polygraph exam was taken or was refused. As with other evidence, such as hearsay, the trial judge may give the jury cautionary instructions to prevent improper use of the evidence. Of course, if the danger of improper use is too great, ... Rule of Evidence 403 will be grounds for excluding it.
In the instant case, the prosecutor appeared to be seeking to corroborate Earnest Stevens' testimony when he prompted Detective Brown to mention Stevens' agreement to submit to a lie detector test. It is important to note, however, that the defense had already sought to impeach Stevens' veracity while cross-examining Stevens. The defense first sought to establish that Stevens had lied under oath when pleading guilty to a simple assault charge.
Q. Okay, I will ask that question; what did you do to get in contempt of Court?
A. Simple assault.
.....
Q. You assaulted someone?
A. No, I didn't, but that is what they say.
Q. Were you convicted of this?
A. I pled guilty to it.
Q. When you pled ... guilty to it, you had to take an oath just like you took today saying that it's the truth, that you did what they accused you of; is that correct?
.....

*1259 A. Yes, sir.
Q. But you really didn't do it?
A. Not that time I didn't.
Later, the defense attorney tried a different tack:
Q. Earnest, do you always tell the truth?
A. Always?
Q. Yes.
A. I try to.
Q. Do you sometimes lie?
A. I won't say I won't lie.
.....
Q. Were you lying when you said you saw Ronnie Conner put that lady in that car?
A. No, I was not.
Q. You hesitated for a second there, didn't you?
BY THE COURT: Mr. Stevens, you have a right to explain any answer that you want to make, so long as it is relevant to the question that is being asked. Go ahead.
Q. Were you lying when you said you saw Ronnie Conner push that lady in that car?
A. No, I am not lying.
Q. You always tell the truth?
A. I won't say always, but that is the truth.
M.R.E. 608(b) states that once a witness's integrity has been impugned,
[s]pecific instances of the conduct of a witness, for the purpose of ... supporting his credibility, . .. may ... in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.
The second exception found in Rule 608(b) would applies in the instant case. When Detective Brown testified about Stevens' agreement to take a polygraph exam, the defense had already launched an attack on Stevens' credibility. Further, Detective Brown was in the midst of testifying about the means by which the police had sought to verify the truth of Stevens' statement. The only question remaining is whether an agreement to submit to a lie detector test is "probative of truthfulness or untruthfulness." While the reliability of lie detector results is subject to debate, it is probably true that a person's willingness to submit to such a test, particularly where he has little to lose by not taking it, tends to indicate that the person believes he is telling the truth. The person's subjective response to the prospect of polygraphic examination, regardless of whether he takes one, amounts to a specific instance of conduct which is probative on the issue of truthfulness.
Although this Court has never explicitly held that references to polygraph tests are admissible when used to rehabilitate an impeached witness, the Court did find in Pittman v. State, 236 Miss. 592, 111 So.2d 415 (1959), that a reference to such a test on redirect examination, where the results of the test were not disclosed, did not amount to reversible error. See Pittman, 236 Miss. at 597-98, 111 So.2d at 417. In light of Stringer, Pittman, and M.R.E. Rule 608, we find that the trial court did not abuse its discretion by permitting the prosecution to introduce evidence concerning Earnest Stevens' agreement to take a lie detector test.
A separate but related question is whether the prosecution's reference in closing argument to Stevens' willingness to take a lie detector test constituted reversible error. We hold that it did not. Since the trial court did not err in admitting the evidence, then the prosecutor can hardly be faulted for referring to it in closing argument.

VII.

DID THE TRIAL COURT ERR IN PERMITTING THE STATE TO INTRODUCE THE WRITTEN PRIOR INCONSISTENT STATEMENT OF WITNESS FRANK BLAIR?
Frank Blair's testimony at trial differed somewhat from what he said in his statement given on January 4, 1990. The first divergence concerned the amount of money Conner had when Blair saw him on the morning *1260 of January 1, 1990. At trial, Blair testified that when he saw Conner at the Plasma Center on January 2, 1990, Conner had six cents. He could not recall whether Conner had any money on January 1. In his January 4 statement, Blair said that Conner had only six cents on January 1 and that Conner did not show him any money on January 2. The second conflict concerns the conversation which transpired between Blair and Conner on New Year's Day. In his statement, Blair related the following:
We got that drink and he said "Man I have to do something." I said "Man you ain't got to go through all that." I told Ronnie that "Man you only have a few more days before you get your check." Ronnie said, "Man, I need money now."
At trial, Blair could not remember saying "Man you only have a few more days before you get your check." Thirdly, Blair testified at trial that Conner had a pocket knife on January 2. In his statement, he indicated that he saw the knife in Conner's possession on the first day of January.
After reviewing his written statement, Blair acknowledged that he remembered more about what happened on New Year's Day when he gave the statement than he did on the day of trial. He also conceded that the statement was more accurate than his trial testimony. The State introduced the January 4 statement into evidence as a prior inconsistent statement.
Conner argues that since Blair admitted making the prior inconsistent statements, the court erred by admitting the prior written statement into evidence. In Moffett v. State, 456 So.2d 714 (Miss. 1984), this Court held:
Where the non-party witness admits having made the prior, out-of-court statement, the statement where reduced to written form, should never be introduced into evidence.
If the witness confesses or admits having made prior inconsistent statements, ordinarily there is no necessity for further proof, as by the admission of the prior inconsistent written statement.
Id., at 719 (quoting Davis v. State, 431 So.2d 468, 473 (Miss. 1983)). The Court noted that unsworn, out-of-court statements are not admissible except for impeachment, and that where the witness admits making past statements which contradict his trial testimony, the witness stands impeached without introducing the writing into evidence. Moffett, 456 So.2d at 719-20. The Court recently reaffirmed Moffett, a pre-rules case, in Brown v. State, 556 So.2d 338 (Miss. 1990). Contrary to what the State argues, Moffett and Brown do not appear to contradict M.R.E. Rule 613(b) which states:
Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require.
Even under Rule 613, once a witness "explains" a prior inconsistent statement by admitting it, the statement cannot be admitted into evidence. See Marcum v. Mississippi Valley Gas Co., 587 So.2d 223 (Miss. 1991), overruled on other grounds, Whigham v. State, 611 So.2d 988 (Miss. 1992). It is therefore apparent that the trial court erred by admitting Frank Blair's written statement into evidence.
The trial court cured its error, however, by instructing the jury that the statement could not be considered as substantive evidence. Instruction D-16 provides:
The Court instructs the Jury as follows:
1. You may consider Frank Blair's written statement as evidence of the credibility of the witnesses in this case.
2. Frank Blair's written statement is not [to] be considered as proof of the truth of the statement.
The trial court in Moffett gave a similar instruction. According to this Court:
We note that the trial judge [in Moffett] correctly instructed the jury that the impeaching statement could not be considered as substantive evidence touching Moffett's guilt or innocence. Instruction No. D-21 provides:

*1261 The Court instructs the jury that if a witness recants, under oath, a prior unsworn statement that witnesses credibility may then be impeached by the use of that prior inconsistent unsworn statement. However, that prior inconsistent unsworn statement cannot be considered by the jury as substantive evidence in the case. The prior inconsistent unsworn statement can only be used to show credibility.
We have considered whether this instruction may have cured the error. Upon reflection, this instruction makes us wonder why the prior unsworn statement was ever admitted in the first place, for the trial judge obviously knew what the law was on the point. Considering that the prior unsworn statement was the sole support for a central issue in the case and considering the fact that the prosecuting attorney vigorously argued it as a reason why the jury should find Moffett guilty, the error was not cured.

Moffett, 456 So.2d at 720 (emphasis added). In Brown, the jury was not instructed concerning how they should view the improperly admitted statement. The Court found that "[e]ven if a limiting instruction had been given, however, we doubt that it would have sufficed to cure the error, because without these statements, there simply was no case." Brown, 556 So.2d at 340 (emphasis added).
The instant case is far different. The statements Frank Blair could not recall making were certainly not "the sole support for a central issue in the case," nor was the prosecution left with "simply no case" in their absence. Further, the prosecution in closing argument made at most a glancing reference to the conflict between Blair's trial testimony and his prior statement:
Well, if you believe Frank Blair, like defense counsel suggests, please remember that before Ronnie Conner, the Defendant, left Frank Blair's presence he told Frank Blair, man, I got to go do something or I got to go get some money. He said one of those two things. Frank Blair wasn't quite clear on what it was, but it was something to the effect, man, I got to go do something.
Moreover, Blair's testimony supplied much of the information the State sought to introduce even without benefit of the prior statement. Blair's trial testimony clearly implies that Conner was desperate for money on January 1, and it includes Conner's admission on January 2 that he had "got into some shit." Additionally, Blair testified that he saw Conner with a pocket knife. Regardless of whether Conner had the knife on January 1 or January 2, the testimony serves to refute Conner's later testimony that he owned nothing but "butter knives."
We find that Instruction D-16 cured any error which may have resulted from the admission of Frank Blair's written statement into evidence.

VIII.

DID THE TRIAL COURT ERR IN ADMITTING CONNER'S STATEMENT INTO EVIDENCE?
The written statement Ronnie Conner gave to the police on the day following the crime is hopelessly at odds with the alibi defense he presented at trial. Although the writing was not introduced as evidence, the prosecution made repeated references to it throughout the trial. Conner contends that the trial court should have excluded all evidence relating to the statement.
Conner first characterizes the statement as a "confession" and argues that use of the statement is prohibited by Agee v. State, 185 So.2d 671 (Miss. 1966), which holds that where the voluntariness of a confession is contested, all law enforcement officials present at the scene of the confession must appear at trial. Agee is obviously inapplicable since Conner's statement is by no stretch of the imagination a "confession." In fact, he categorically denied committing the crime when he made the statement.
Conner also contends that the trial court erred in allowing the prosecution to use the statement as a tool to impeach his alibi witnesses. Conner cites Ray v. State, 503 So.2d 222 (Miss. 1986), a case in which the State used the defendant's notice of alibi to impeach a defense witness. This Court held:

*1262 Where no predicate has been laid by showing that the Defendant Ray signed or provided the specific information contained in the Notice of Alibi, it may not be used as impeachment or rebuttal evidence.
Ray, 503 So.2d at 225 (emphasis added). Ray obviously does not help Conner. A notice of alibi is fundamentally different from a statement given to the police. As the Court in Ray observed:
The function of the notice of alibi is to afford the prosecution advance notice that the defendant may claim an alibi and that, if he does, his evidence will be thus and such. In this way the prosecution is afforded a reasonable opportunity to investigate the alibi and be prepared to offer counter evidence at trial if the alibi is in fact asserted. The rules, however, do not require that a defendant giving notice of alibi go forward with the alibi. As a matter of trial strategy, the defendant and his attorney are free to change their mind regarding the defense to be offered.
Ray, 503 So.2d at 225. When an accused makes a statement before the police, he is not crafting a legal document, the prime aim of which is to facilitate trial strategy. Instead, he is making representations of personal knowledge which are presumed to be true until proven otherwise. As for the requirement of a predicate, Detective James Brown testified that the contents of Conner's statement came from Conner's own mouth. Since Conner provided the "specific information contained" in the statement, the trial court did not err in permitting the prosecution to use the statement for impeachment purposes.

IX.

DID THE TRIAL COURT ERR IN ALLOWING THE PROSECUTOR TO IMPEACH DEFENSE WITNESSES ON COLLATERAL MATTERS?
Conner argues that the State impermissibly impeached two of his alibi witnesses on collateral matters. According to Kelly v. State, 278 So.2d 400, 402 (Miss. 1973): "The rule is well settled in this state that it is error to contradict a witness about an immaterial or collateral matter."
The first witness Conner deems to have been wrongfully impeached was Dorothy Neal. According to Neal, she knew exactly the time at which the defendant arrived at and departed from Perkins Grocery because she was watching the clock in anticipation of a four o'clock appointment. Cross-examining Neal about the appointment, the prosecutor questioned her as follows:
Q. You were going to go get some money or something?
A. Yes, I had to go pick up some money to get my girl a pair of shoes.
Q. Who were you going to get the money from?
A. Baby Horace.
Q. Is Baby Horace, Horace Peterson?
A. Yes.
Q. Do you know where he works?
BY MR. WILSON: Your Honor, that is irrelevant.
BY THE COURT: Overruled, she is on cross-examination.
A. Well, no. Well, last I seen him and talked to him he was working at East Mississippi.
Q. Is that East Mississippi State Hospital?
A. Yes, that is where he was last was working. I don't know if he is still there or not.
Q. Are you aware that the personnel director of East Mississippi State Hospital has no record of a Horace Peterson working there in January of 1990?
A. January 1990?
Q. Yes.
A. That is where he was working at when I was seeing him. I didn't ask him was he still working there or not. I assumed that is where he was still working, that is why I said that was where he was working because the last time I talked to him that is where he was working.
Q. Your testimony then was based on an assumption?
A. Yeah.
Q. I want to remind you that you need to testify to what you know.

*1263 A. Uh-huh.
Q. Has any of your other prior testimony been based on an assumption?
A. No. About me seeing Ronnie and being with Ronnie that day, that's the truth.
The State concedes in its appellate brief that the place of Peterson's employment was a collateral matter. Unquestionably, therefore, it was error to permit the prosecution to impeach Dorothy Neal on that point.
We find that the impeachment, though improper, was harmless. Even before the prosecutor tried to impeach her, Dorothy Neal acknowledged that she was uncertain about Peterson's place of employment. In fact, Neal never said that Peterson was employed at East Mississippi in January of 1990. After the prosecution's attempt at impeachment, Neal offered a very reasonable clarification of her earlier statement. We can say with confidence that the prosecution's attempt to impeach Dorothy Neal by questioning her about Horace Peterson's employment did not prejudice the defendant.
Secondly, Conner attacks the prosecution's impeachment of T.C. Taylor. Taylor testified that he knew that Conner came by his house at 1:30 p.m. on the day of the murder because "I had my watch on" and because he had gone out onto the porch after watching "The Price is Right" and then getting dressed. The prosecution sought to impeach Taylor by having Dawn Walker, the program director for WTZH-TV in Meridian, testify that "The Price is Right" and Bob Barker did not air on New Year's Day, 1990.
Conner insists that TV programming on the day of the murder is a collateral matter "because Mr. Taylor never testified that he watched these particular programs on that day." Conner's reading of the record is inaccurate. The cross-examination of T.C. Taylor ended with the following exchange:
Q. Mr. Taylor, I have a few brief questions. What channel do you normally watch on your TV?
A. I watch both of them, 24 and channel 11.
Q. Do you recall which one you were watching on January 1st that morning?
A. Channel 24.
Q. The Price is Right is what you were watching?
A. Yes, sir.
There is no merit in Conner's contention that the prosecution improperly impeached T.C. Taylor's testimony on a collateral matter.

X.

DID THE TRIAL COURT DENY THE DEFENDANT THE OPPORTUNITY TO CONFRONT A STATE'S WITNESS?
While cross-examining Earnest Stevens, defense counsel asked him if he had been employed within the past two years. Stevens indicated that he had worked "four or five or six" months the year before for his cousin Velma Griffin, a roofer. The defense later sought to call Griffin as a witness, purportedly to testify that Stevens had not worked for him. In proceedings outside the jury's presence, the trial court refused to permit Griffin to testify on grounds that Earnest Stevens' employment was a collateral issue not subject to impeachment.
According to Conner, the trial court's refusal to let him impeach Stevens on the employment issue amounts to a deprivation of his constitutional right to confront Stevens, his accuser. It is true that the accused has a broad right to confront and cross-examine the witnesses against him. See Williamson v. State, 512 So.2d 868 (Miss. 1987); Hamburg v. State, 248 So.2d 430 (Miss. 1971). That broad right, however, applies only to issues pertinent to the crime with which the defendant is charged. Stringer v. State, 500 So.2d 928, 933 (Miss. 1986). The general rule that a party may not impeach a witness on collateral matters still applies.
Whether a particular issue is material to the issues of the case or merely collateral is a matter committed to the discretion of the trial court under Rule 103 of the Mississippi Rules of Evidence. See Barnes v. State, 532 So.2d 1231, 1234 (Miss. 1988).
Conner strenuously argues in Issue IX, supra, that Dorothy Neal's testimony about Horace Peterson's employment related *1264 to a collateral issue. There is no good reason why Velma Griffin's proposed testimony about Earnest Stevens' employment should be classified differently. The trial court did not abuse its discretion in refusing to permit Velma Griffin to testify.

XI.

DID THE STATE INTENTIONALLY STRIKE BLACK PERSONS AND WOMEN FROM THE JURY IN THIS CASE IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION?
Conner complains on appeal that during jury selection, the prosecution exercised all five of its peremptory challenges against females, three of whom were black. The empaneled jury had one black member and at least four females.
We cannot address this issue because Conner never objected to the prosecution's peremptory challenges. This Court has often held that a party waives any and all claims regarding the composition of his jury if he fails to raise an objection before the jury is sworn. See Shaw v. State, 540 So.2d 26, 27 (Miss. 1989); Thomas v. State, 517 So.2d 1285, 1827 (Miss. 1987); Pickett v. State, 443 So.2d 796, 799 (Miss. 1983). The error, if any, is precluded from review.

XII.

DID THE PROSECUTOR'S CLOSING ARGUMENT SHIFT THE BURDEN OF PROOF FROM THE STATE TO THE DEFENDANT?
In the concluding segment of its closing argument, the prosecution stated the following:
BY MR. ANGERO: Ladies and gentlemen, I don't know if I have ever seen a defense quite like the one that was put on in this case. You have six witnesses that testified. Three of the witnesses do not give any relevant times. Because that instruction says that he had to be in a place so remote and distant that he could not have committed the offense, they haven't shown it, except possibly from one witness. The one witness that their whole defense hinges on is Dorothy Neal. Dorothy Neal is mistaken about the day.
(emphasis added). Conner maintains that the phrase "they haven't shown it" shifted the burden of proof to the defendant and deprived him of his right to a presumption of innocence.
It is well settled that the burden of proof never shifts from the state in a criminal case. Brown v. State, 556 So.2d 338, 339 (Miss. 1990); McVeay v. State, 355 So.2d 1389, 1391 (Miss. 1978). Moreover,
the defendant's option to develop proof of alibi, . .. does not operate to shift the burden of proof.... Every mandatory element of proof is assigned to the prosecution. Neither the burden of production nor the burden of proof ever shift to the defendant.
Gray v. Lucas, 677 F.2d 1086, 1105-06 (5th Cir.1982).
Upon reading the phrase "they haven't shown it" in context, one immediately realizes that the prosecutor's closing argument does not involve a shift in the burden of proof. The prosecutor did not tell the jury (or even imply) that a failure on the part of Conner to establish his alibi should automatically translate into a verdict of guilty. The prosecutor merely stated that defense had not proven or "shown" that Conner was "in a place so remote and distant that he could not have committed the offense" at the time when the crime occurred. Whether the State proved that Conner was at the scene of the crime is a different matter altogether. The assignment of error has no merit.
Finding no reversible error in the trial below, the conviction for capital murder is affirmed.

SENTENCING PHASE
The defendant raises fifteen issues on appeal in the sentencing phase. They are discussed below as Sections XIII to XXVII.

XIII.

IS THE SENTENCE OF DEATH DISPROPORTIONATE WHEN COMPARED TO OTHER CASES IN WHICH THE DEATH PENALTY HAS BEEN IMPOSED IN MISSISSIPPI?
In all cases involving a sentence of death, Miss. Code Ann. § 99-19-105 requires this *1265 Court to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." See Irving v. State, 361 So.2d 1360, 1361 (Miss. 1978) (proportionality review involves comparison to other death penalty cases since Jackson v. State, 337 So.2d 1242 (Miss. 1976), cert. denied, 441 U.S. 913, 99 S.Ct. 2014, 60 L.Ed.2d 386 (1979); see also Gray v. State, 472 So.2d 409, 423 (Miss. 1985) (proportionality review insures that "the penalty is neither wanton, freakish, excessive, nor disproportionate"), rev'd. on other grounds, Gray v. Mississippi, 481 U.S. 648, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987).
Conner argues that in the instant case, his mental condition and emotional history mitigate against a sentence of death. See Penry v. Lynaugh, 492 U.S. 302, 318, 109 S.Ct. 2934, 2947, 106 L.Ed.2d 256 (1989) (mental problems and emotional impairment can lessen culpability for criminal acts). Conner emphasizes that he was diagnosed by the Weems Community Health Center as schizophrenic and that he hears "voices." He asserts that he once jumped off of a moving train at the bidding of one such "voice" and fractured his clavicle. Conner also points to his purported lack of long- and short-term memory, his pre-trial suicidal "gesture," his "limited intelligence," and his dependence on his mother to manage his finances. The staff of Whitfield State Mental Hospital, which examined Conner prior to trial, portrayed Conner somewhat differently. The Whitfield report stated that Conner exhibited "few if any" symptoms of schizophrenia. In contrast to his professed amnesia at trial, Conner, at Whitfield, "described the time period surrounding the crime and he showed no impairment in his memory for that period." The Whitfield examination occurred three or four months after the crime.
Regarding Conner's intellectual capacity, the Whitfield report found that Conner
was able to describe the charge against him in a relevant manner and he knew the possible consequences of conviction. He had a good understanding of the basic proceedings he might face in court, including the roles of various participants in court, the behavior expected of him in the courtroom... . He appears to have a rational as well as factual understanding of the charges against him and he appears capable of assisting his attorney in preparing a defense.
The Weems Community Health Center placed Conner's level of intelligence on the low side of "average."
In contrast to the Weems suggestion that Conner could not control his antisocial behavior, the staff at Whitfield "was unanimous in the opinion that he [Conner] knew the difference between right and wrong in relation to his actions."
Conner compares his case to Edwards v. State, 441 So.2d 84 (Miss. 1983), a case wherein a three-member plurality of this Court found that, although the defendant apparently knew the difference between right and wrong, his death sentence could not stand due to his "long history of suffering from the mental disease schizophrenia of a paranoid type." Edwards, 441 So.2d at 93. Edwards is of no precedential value to us since it represents a plurality vote.
In the recent case of Churchill v. Pearl River Basin Development District, 619 So.2d 900 (Miss. 1993), we stated that "normally a majority vote of all sitting judges is required to create precedent" and it follows that a plurality vote does "not create a binding result." Churchill, 619 So.2d at 904. Edwards is also inapplicable here since the record does not indicate that Conner was ever diagnosed as suffering from paranoid schizophrenia. There is absolutely nothing to indicate that he felt he was "being maligned, mistreated, or perhaps in danger of losing his life in totally imaginary ways at the hands of" Celeste Brown.
Conner's condition finds a closer parallel in Lanier v. State, 533 So.2d 473 (Miss. 1988). Examining the proportionality of the defendant's death sentence, the Court in Lanier stated:
Appellant argues that the imposition of the death penalty is improper in the present case due to the fact that he has an IQ of 61, has been plagued in the past with experiencing hallucinations ranging from *1266 demons to elephants, has gone on destructive rampages, has on two prior occasions been placed in mental institutions, and because he is an alcoholic and a chronic drug abuser. In making this argument, Lanier principally relies upon Edwards v. State, 441 So.2d 84 (Miss. 1983).
In Edwards, a plurality of this Court determined the imposition of the death penalty to be disproportionate where the criminal defendant was a seriously and dangerously mentally ill person, with a long history of schizophrenia of a paranoid type. 441 So.2d at 93. In the case of Johnny Lanier, although his IQ of 61 indicates "mild mental retardation" and there is proof of hallucinations in the past, this would not rise to the same level as the severe mental disease found in the Edwards case.
Lanier, 533 So.2d at 492.
The death penalty is not so disproportionate to Ronnie Conner's crime as to require reversal.

XIV.

DID THE TRIAL COURT ERR BY EXCLUDING MITIGATION EVIDENCE?
During the direct examination of Dorothy Conner, the defendant's sister, defense counsel asked: "Could you give us some examples of when he heard voices?" The prosecution successfully objected on grounds of hearsay. Conner maintains that the trial court erred in sustaining the prosecution's objection and argues that under Green v. Georgia, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979), a state evidentiary rule cannot operate to exclude otherwise relevant mitigating evidence.
Conner reads Green too broadly. In Green, two co-defendants, Moore and Green, were tried separately for murder. Moore was tried first. A witness who testified for the State in Moore's trial was called to testify for the defense in Green's trial. The witness was prepared to testify that, according to Moore's own admission, Moore had actually killed the victim while Green was away on an errand. Upon a hearsay objection from the prosecution, the trial court refused to admit the testimony. The State then urged the jury to infer that Green was directly involved in the murder because more than one bullet was fired into the body of the victim. On appeal, the U.S. Supreme Court held:
Regardless of whether the proffered testimony comes within Georgia's hearsay rule, under the facts of this case its exclusion constituted a violation of the Due Process Clause of the Fourteenth Amendment. The excluded testimony was highly relevant to a critical issue in the punishment phase of the trial,... and substantial reasons existed to assume its reliability. Moore made his statement spontaneously to a close friend. The evidence corroborating the confession was ample, and indeed sufficient to procure a conviction of Moore and a capital sentence. The statement was against interest, and there was no reason to believe that Moore had any ulterior motive in making it. Perhaps most important, the State considered the testimony sufficiently reliable to use it against Moore, and to base a sentence of death upon it. In these unique circumstances, "the hearsay rule may not be applied mechanistically to defeat the ends of justice." Chambers v. Mississippi, 410 U.S. 284, 302 [93 S.Ct. 1038, 1049, 35 L.Ed.2d 297] (1973).
Green, 442 U.S. at 97, 99 S.Ct. at 2151-52 (emphasis added).
No such "unique circumstances" exist in the instant case. The indicia of reliability attendant to the hearsay statement in Green would not be present in whatever Dorothy Conner might have said about the voices her brother heard. Further, the testimony at issue here, unlike that in Green and Chambers, is not of the type that would virtually compel a different result were it admitted into evidence.
Moreover, the statements do not fall with the boundaries of M.R.E. 701 which allows opinion testimony by a lay witnesses. Rule 701 states that non-expert witnesses will be allowed to give their opinion as to the sanity of the defendant only if they first detail relevant facts known to them, based on events which they have observed, on which the opinion will be based. Groseclose v. *1267 State, 440 So.2d 297, 301 (Miss. 1983); Harvey v. State, 207 So.2d 108, 117-18 (Miss. 1968); McGarrh v. State, 249 Miss. 247, 257, 148 So.2d 494, 497, cert. denied, 375 U.S. 816, 84 S.Ct. 50, 11 L.Ed.2d 51 (1963); Keeler v. State, 226 Miss. 199, 205, 84 So.2d 153, 156 (1956). Standing in the way to the introduction of this evidence is one of the two "hurdles" that must be crossed before opinion testimony by a lay witness will be admissible pursuant to M.R.E. Rule 701. Lay opinions will be admissible when two considerations are met:
The first consideration is the familiar requirement of first-hand knowledge or observation. The second consideration is that the witness' opinion must be helpful in resolving the issues. Rule 701, thus, provides flexibility when a witness has difficulty in expressing himself in language which does not reflect an opinion. Rule 701 is based on the recognition that there is often too thin a line between fact and opinion to determine which is which.
Official Comment to M.R.E. Rule 701.
It is the consideration as to first-hand knowledge which is of concern. When did the alleged train incident occur  ten years ago  five years ago? Dorothy Conner did not demonstrate to the trial court that she had first-hand knowledge of any of the events which she described. The defense laid no predicate which would indicate that she was present at any of the events which she began to describe. Defense counsel did specifically ask Dorothy to describe "some things that you have personally observed and heard involving Ronnie hearing voices" but did not ask her the appropriate questions, leading up to his asking for the description, for this Court to say that a proper foundation was laid for introduction of this opinion. From everything that can be understood from the record it appears that Dorothy Conner was testifying to events of which she had knowledge only because her brother, Ronnie, told her about them. Because a proper foundation for this opinion was not laid, the trial court had no reason to believe that Dorothy Conner had any independent knowledge of the events which she described aside from her brother's telling her about them. As such, this evidence was garden variety hearsay and rightfully excluded.
Lastly, in the case sub judice no medical experts testified on Conner's behalf. The defense used no medical testimony to support its position that Conner was mentally incompetent. Thus, no extrinsic evidence on this matter could be allowed since it would be "find[ing] additional facts" rather than merely trying to evaluate complex medical testimony that had been elicited at trial. The only medical evidence related to this matter whatsoever appears in the very last exhibit introduced at trial. Exhibit 29 contained several documents from Weems Community Mental Health Center in Meridian, Mississippi, where Conner had apparently received treatment of some type. All the documents were filed by a "W.M. Wood, M.D.," but Dr. Wood was not called to testify at trial. Nowhere in any of the documents does Dr. Wood describe Conner as being diagnosed as a "schizophrenic." The only medical document that refers to Conner being diagnosed as "schizophrenic" is a letter, dated May 1, 1990, from the Mississippi State Hospital at Whitfield, Mississippi, written by Helen C. Robertson, Ph.D. and Margie Lancaster, M.D., which was filed in response to a request from the trial court asking if Conner was competent to stand trial. The letter states:
Mr. Conner had been treated at the Mental Health Center for a number of years and has a Schizophrenic diagnosis. We have retained this diagnosis, although he has shown few if any of the symptoms of this disorder during his stay in the hospital. He is on medication and this could account for the lack of symptoms. We have given him a diagnosis of Personality Disorder Not Otherwise Specified to reflect a longstanding pattern of social discomfort, excessive dependency, and a tendency to take out his anger in indirect and passive ways.
The letter further stated:
The staff was unanimous in the opinion that he is competent to stand trial at the present time. He appears to have a rational as well as factual understanding of the charges against him and he appears *1268 capable of assisting his attorney in preparing a defense. With regard to his sanity at the time of the crime, the staff was unanimous in the opinion that he knows the difference between right and wrong in relation to his actions.
Trial was held on July 23, 1990. As stated previously, no testimony was adduced at trial from either of these doctors. They, in their letter, merely refer to the fact that Conner was at one time diagnosed as schizophrenic, but they comment that they saw very little which indicated to them that he was "schizophrenic." In sum, the record is devoid of any medical testimony that indicated Conner was schizophrenic at the time of the murder. Likewise, there is no affirmative statement in the record that Conner was ever "diagnosed" as schizophrenic aside from the inference which could be gathered from the passing reference to such in the letter from the Mississippi State Hospital received by the trial court several months before trial. His mental condition was determined prior to trial when the doctors stated that he knew the difference between right and wrong and could assist counsel in the preparation of his defense.
For all the foregoing reasons, this assignment of error has no merit.

XV.

DID THE TRIAL COURT ERR IN INSTRUCTING THE JURY AT SENTENCING THAT "ROBBERY IS A CRIME OF VIOLENCE"?
Instruction S-17 enumerated five aggravating factors the jury could consider when deciding whether to impose the death penalty:
(1) Whether the capital offense was committed while the Defendant was engaged in the crime of Kidnapping.
(2) Whether the capital offense was committed while the Defendant was engaged in the crime of Robbery.
(3) Whether the capital offense was committed for pecuniary gain.
(4) Whether the capital offense was especially heinous, atrocious, or cruel.
(5) Whether the Defendant was previously convicted of a felony involving the use of [sic] threat of violence to the person.
Instruction S-18 informed the jury that "Robbery is a crime of violence." Conner argues on appeal that Instruction S-18 created an irrebuttable presumption that the attempted robbery he admitted committing in 1986 was a violent act and thus compelled the jury to find the fifth aggravating factor. He further contends that his 1986 crime was in fact non-violent.
Conner's argument cannot withstand analysis. Miss. Code Ann. § 97-3-73 (1972) defines the crime of robbery as the act of taking "the personal property of another, in his presence or from his person and against his will, by violence to his person or by putting such person in fear of some immediate injury to his person." (Emphasis added). This is the statute under which Conner was charged in 1986, and it is the statute under which he pled guilty.
The 1986 crime involved an attempt by Conner to snatch cash from a cash register in a liquor store. While the record does not indicate that Conner had a weapon on that particular occasion, Conner acknowledged in his sentencing trial below that the cash register attendant grabbed him and held him at bay with a gun until the police could arrive. Weapon or no weapon, it is unreasonable to argue that the incident did not involve at least the implied threat of violence. The very act of reaching across a store counter in the presence of a clerk and seizing money from a cash register intimates a willingness to resort to violence.
This Court has expressly held that robbery is per se a crime of violence. See Rome v. State, 562 So.2d 121, 123 (Miss. 1990) ("Robbery is a crime of violence by definition."); Magee v. State, 542 So.2d 228 (Miss. 1989); Ashley v. State, 538 So.2d 1181 (Miss. 1989). Conner cites Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), for the proposition that such a characterization vitiates the constitutional requirement that a conviction be supported by proof of every fact necessary to constitute the crime charged. See In re Winship, 397 U.S. 358, *1269 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970) (due process protects against conviction except upon proof beyond reasonable doubt of every fact necessary to constitute crime). Sandstrom, however, addresses an issue quite different from the one now before the Court.
In Sandstrom, the defendant was charged with "purposefully and knowingly" causing the death of the decedent. The trial court instructed the jury that "the law presumes that a person intends the ordinary consequences of his voluntary acts." The United States Supreme Court held that this instruction relieved the State from the responsibility of proving specific intent, a necessary element of the crime charged. Sandstrom, 442 U.S. at 524, 99 S.Ct. at 2459.
The assignment of error is without merit.

XVI.

WAS THE "PECUNIARY GAIN" AGGRAVATING CIRCUMSTANCE APPLIED IN A VAGUE AND OVERBROAD MANNER?
Conner contends that the trial court erred by allowing the jury to consider his previous robbery conviction along with the "pecuniary gain" motive as separate aggravating factors in determining whether to impose the death penalty. At the time of Conner's trial, an instruction allowing the jury to consider both factors was permissible. See Ladner v. State, 584 So.2d 743 (Miss.), cert. denied, ___ U.S. ___, 112 S.Ct. 663, 116 L.Ed.2d 754 (1991); Wiley v. State, 484 So.2d 339, 351 (Miss.), cert. denied, 479 U.S. 906, 107 S.Ct. 304, 93 L.Ed.2d 278 (1986). In Willie v. State, 585 So.2d 660 (Miss. 1991), this Court announced a new rule:
When life is at stake, a jury cannot be allowed the opportunity to doubly weigh the commission of the underlying felony and the motive behind the underlying felony as separate aggravators.
Willie, 585 So.2d at 681.
Although Willie expressly made the new rule prospective in application, Conner defines "prospective" as applying to "all cases tried after the trial in the case that announces the new rule." Willie was tried in 1989; Conner was tried in 1990. Therefore, Conner argues, the rule announced in Willie should apply to him. The Court's express language in Willie defeats this argument. The Court ruled that the new rule "is to be prospective and will take effect from this date forward." Willie, So.2d at 681. The words "this date," of course, refer to July 24, 1991, the day on which Willie was decided. Conner was tried long before the effective date of the Willie rule regarding the dual use of pecuniary gain and robbery as aggravating factors.
Conner further argues that rules of the type announced in Willie must apply retroactively as a matter of federal law. He cites Teague v. Lane, 489 U.S. 288, 300, 109 S.Ct. 1060, 1069, 103 L.Ed.2d 334 (1989), which holds that "once a new rule is applied to the defendant in the case announcing the rule, evenhanded justice requires that it be applied ... to all who are similarly situated." See also Griffith v. Kentucky, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987). Conner misses the point of Teague. The United States Supreme Court in Teague prohibited "selective prospectivity," i.e., the practice of applying the new rule to the defendant in the case where the rule is announced but not to other defendants whose cases arose prior to the announcement. Teague in no way forbids the practice of "pure prospectivity," in which the new rule is applied neither to the defendant in the case where the rule is announced nor to other defendants whose cases arose before the new rule was announced. Since the defendant in Willie did not benefit from the ruling in that case, Teague does not apply here.
The trial court did not err in permitting the jury to consider both robbery and the quest for pecuniary gain as aggravating factors.

XVII.

WAS THE "ESPECIALLY HEINOUS" AGGRAVATING CIRCUMSTANCE APPLIED IN A VAGUE AND OVERBROAD MANNER?
At issue in this assignment of error is Instruction S-15, which reads:

*1270 The Court instructs the Jury that in considering whether the Capital offense was especially heinous, atrocious, or cruel, heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with indifference to or even enjoyment of the suffering of other(s).
An especially heinous, atrocious, or cruel capital offense is one accompanied by such additional acts as to set the crime apart from the norm of murders  the conscienceless or pitiless crime which is unnecessarily torturous to the victim. This can be shown by the fact that the Defendant utilized a method of killing which caused serious mutilation where there is a dismemberment of the corpse, where the defendant inflicted physical or mental pain before death, where there was mental torture and aggravation before death or where a lingering or torturous death was suffered by the victim.
This limiting instruction was given in conjunction with Instruction C-10 which listed "Whether the capital offense was especially heinous, atrocious, or cruel" as a potential aggravating factor. Conner insists on appeal that the definitions of "especially heinous, atrocious, or cruel" contained in the limiting instruction are unconstitutionally vague and overbroad.
The United States Supreme Court in Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), found that the phrase "especially heinous, atrocious, and cruel," when designated as an aggravating factor in a death penalty case, gives a jury an unconstitutional degree of discretion when unaccompanied by a proper limiting instruction. See Godfrey v. Georgia, 446 U.S. 420, 428, 100 S.Ct. 1759, 1765, 64 L.Ed.2d 398 (1980) (instructions defining aggravating circumstances must set forth "clear and objective standards").
In Shell v. State, 554 So.2d 887, 905-06 (Miss. 1989), rev. in part, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990), this Court approved a limiting instruction which provided:
[T]he word heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with indifference to, or even enjoyment of the suffering of others.
On appellate review, the United States Supreme Court found that adding this particular limiting instruction was not enough: "Although the trial court in this case used a limiting instruction to define the `especially heinous, atrocious, or cruel' factor, that instruction is not constitutionally sufficient." Shell v. Mississippi, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990). In light of Shell v. Mississippi, it is apparent that the first sentence of Instruction S-15, standing alone, does not meet constitutional requirements of clarity and objectivity.
The U.S. Supreme Court implicitly approved language similar to the second sentence of Instruction S-15 as a proper limiting instruction in Clemons v. Mississippi. Referring to this Court's previous opinion in that case, the U.S. Supreme Court noted:
At one point the court recites the proper limiting construction of the "especially heinous" aggravating factor, 535 So.2d [1354] at 1363, and at times the court's opinion seems to indicate that the court was reweighing the mitigating circumstances and both aggravating factors by applying the proper definition to the "especially heinous factor."
Clemons v. Mississippi, 494 U.S. at 750-52, 110 S.Ct. at 1449-50, 108 L.Ed.2d at 740 (emphasis added). Upon turning to 535 So.2d at 1363, the cite at which the U.S. Supreme Court found what it called a "proper definition," one finds the following:
This Court has placed a limiting construction on "especially heinous, atrocious or cruel." In Coleman v. State, 378 So.2d 640 (Miss. 1979), the Mississippi Court adopted the construction found in Spinkellink v. Wainwright, 578 F.2d 582 (5th Cir. 1978), which held:
What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies  the conscienceless or *1271 pitiless crime which is unnecessarily torturous to the victim. 578 F.2d at 611 ...
378 So.2d at 648.
In Evans v. State, 422 So.2d 737 (Miss. 1982), this Court applied a limiting construction of "especially heinous, atrocious or cruel" holding that those cases in which "mental torture and aggravation" were inflicted on the victim the same may also be considered as applying to that aggravating circumstance.
Clemons v. State, 535 So.2d 1354, 1363-64 (Miss. 1988), vacated, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990).
Spinkellink v. Wainwright, 578 F.2d 582 (5th Cir.1978), the case on which the Clemons and Coleman definition was based, sets out the following construction:
It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of the suffering of others, what is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies  the conscienceless or pitiless crime which is unnecessarily torturous to the victim.
Spinkellink, 578 F.2d at 611, cert. denied, 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979).
The close parallel between the language approved by the U.S. Supreme Court as quoted in Clemons v. State and the second sentence in Instruction S-15 suggests that the sentence is sufficiently clear and specific to pass constitutional muster.
The third sentence in Instruction S-15 explains that a "conscienceless or pitiless crime which is unnecessarily torturous to the victim" can encompass such elements as "serious mutilation" or "dismemberment," the infliction of "physical or mental pain" or "mental torture and aggravation before death" and the perpetration of "a lingering or torturous death." The U.S. Supreme Court implicitly approved a limiting instruction of this type in Maynard v. Cartwright, 486 U.S. 356, 363-65, 108 S.Ct. 1853, 1859-60, 100 L.Ed.2d 372, 382 (1988), where it stated:
We also do not hold that some kind of torture or serious physical abuse is the only limiting construction of the heinous, atrocious, or cruel aggravating circumstance that would be constitutionally acceptable.
Maynard v. Cartwright, 486 U.S. at 365, 108 S.Ct. at 1859. The Court could not have said that such an instruction is not the "only" kind which "is" acceptable unless such an instruction were itself acceptable.
In the final analysis, it appears that the jury in the instant case received constitutionally adequate instruction on the "especially heinous, atrocious and cruel" aggravating factor. The bare "especially heinous, atrocious and cruel" language alone is constitutionally vague and overbroad under Clemons v. Mississippi. According to Shell v. Mississippi, the first sentence of Instruction S-15, the limiting instruction, does not sufficiently narrow the scope of the factor. The second and third sentences, however, provide additional specificity and detail sufficient to meet the demands of the Eighth and Fourteenth Amendments to the United States Constitution. See Hansen v. State, 592 So.2d 114, 150-51 (Miss. 1991) (approving limiting instruction which included Coleman language), cert. denied, ___ U.S. ___, 112 S.Ct. 1970, 118 L.Ed.2d 570 (1992); Pinkney v. State, 602 So.2d 1177, 1179 (Miss. 1992) (opining that U.S. Supreme Court had implicitly approved Coleman language).
This assignment therefore is without merit.

XVIII.

DID THE INSTRUCTIONS GIVEN TO THE JURY IMPERMISSIBLY LIMIT THE CONSIDERATION OF MITIGATING EVIDENCE?
Conner argues that the language of Instruction S-17 could have misled the jury to believe that a finding of mitigating circumstances must be unanimous. The United States Supreme Court in McKoy v. North *1272 Carolina, 494 U.S. 433, 442-43, 110 S.Ct. 1227, 1233, 108 L.Ed.2d 369, 381 (1980), found that a jury instruction which requires the jury to unanimously find mitigating circumstances in the balancing process "impermissibly limits jury's consideration of mitigating evidence" and violates the Eighth Amendment. 494 U.S. at 444, 110 S.Ct. at 1234.
Instruction S-17 provides a step-by-step guide for the jury in arriving at its sentencing verdict. Sub-section (A) of the instruction requires the jury to "unanimously" find the elements of murder. Sub-section (B) told the jury that it must find that mitigating circumstances do not outweigh aggravating circumstances in order to return the death penalty. Sub-section (C) listed the available aggravating circumstances and indicated that a finding of one or more aggravating circumstances must be "unanimous." Sub-section (C) also listed the available mitigating circumstances but imposed no requirement of unanimity in finding them. Conner argues that a reasonable juror might have concluded that, since everything else required a unanimous finding, mitigating circumstances required one as well. Conner cites McNeil v. State, 327 N.C. 388, 395 S.E.2d 106 (1990), a case which the United States Supreme Court had remanded to the North Carolina Supreme Court for further consideration in light of McKoy. The North Carolina Court in McNeil concluded that where a jury is informed that aggravating circumstances must be found unanimously but receives no instruction concerning the degree of consensus required for finding the existence of mitigating circumstances, reasonable jurors would believe that the finding of mitigating circumstances must also be unanimous.
This Court expressly rejected this view in Hansen v. State, 592 So.2d 114 (Miss. 1991), cert. denied, ___ U.S. ___, 112 S.Ct. 1970, 118 L.Ed.2d 570 (1992). The Hansen Court ruled as follows:
The jury was instructed that they could employ only such aggravating circumstances as they found (a) unanimously and (b) beyond a reasonable doubt. The Court then told the jury it might consider in opposition mitigating circumstances, gave a loose definition of what those might be, but omitted any burden such as unanimity or beyond-a-reasonable-doubt, only that the jurors consider mitigating circumstances that "are" and thus "exist." Finally, the jury was instructed that, before it could return a sentence of death, it must find beyond a reasonable doubt both that (a) the aggravating circumstances outweigh the mitigating circumstances and (b) that Hansen should be put to death, burdens we have not ordinarily heretofore imposed. [Cites omitted].
In Shell v. State, 554 So.2d 887 (Miss. 1989), rev'd on other grounds, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990), we addressed the adequacy of instructions that did not affirmatively inform each juror that he or she could consider, and weigh against the aggravating circumstances, mitigating circumstances not found unanimously. We recognized that an instruction that prohibits this, expressly or impliedly, is flawed and requires reversal. See Willie v. State, 585 So.2d 660, 680 (Miss. 1991), citing McKoy v. North Carolina, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990), and originally, Mills v. Maryland, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). In Shell the words "unanimous" or "unanimously" did not appear in the mitigating circumstances portion of the jury instructions but instead were found only in the aggravating circumstances portion. We held the instructions did not offend Mills' prohibitory injunction and that Mills contained no affirmative one.
Such is not the case before this Court. The mitigating circumstances portion of the instruction does not contain "unanimous" or "unanimously." Only the aggravating circumstances part contains these words. No instruction says, implies or intimates to any reasonably literate juror that he or she should await unanimity before considering a mitigating circumstance. This issue contains no error. See Turner v. State, 573 So.2d 657, 668 (Miss. 1990), cert. denied, ___ U.S. ___, 111 S.Ct. 1695, 114 L.Ed.2d 89 (1991); Ladner v. State, 584 So.2d 743, 760 (Miss. 1991) and Willie *1273 v. State, 585 So.2d 660, 681 (Miss. 1991), where we rejected a similar argument.
Hansen, 592 So.2d at 149-150.
In light of Hansen, this assignment of error has no merit.

XIX.

DID THE JURY FAIL TO MEET THE REQUIREMENTS OF MISS. CODE ANN. § 99-19-101(7) BEFORE IMPOSING THE DEATH SENTENCE?
Miss. Code Ann. § 99-19-101(7) (Supp. 1990) provides:
In order to return and impose a sentence of death the jury must make a written finding of one or more the following:
(a) the defendant actually killed;
(b) the defendant attempted to kill:
(c) the defendant intended that a killing take place;
(d) the defendant contemplated that lethal force would be employed.
In the instant case, the jury found the following in its sentencing verdict:
1) that the defendant actually killed Celeste Brown;
2) that the defendant attempted to kill Celeste Brown;
3) that the defendant intended that the killing of Celeste Brown take place or;
4) that the defendant contemplated that lethal force would be employed.
Conner takes offense at the word "or" and maintains that the verdict's disjunctive form suggests a lack of unanimity on any one particular fact. He cites Shell v. Mississippi, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990) (Marshall, J., concurring), and Stromberg v. California, 283 U.S. 359, 369-70, 51 S.Ct. 532, 535-36, 75 L.Ed. 1117 (1931), for the proposition that where a jury could have based its verdict on two separate legal theories, the reviewing court cannot attempt to guess on which theory the verdict rests.
The State first notes that Conner waived this assignment of error by failing to object to the form of verdict at trial. See Cole v. State, 525 So.2d 365, 369 (Miss. 1987) (rule that preservation of error requires contemporaneous objection is applicable to capital cases), cert. denied, 488 U.S. 934, 109 S.Ct. 330, 102 L.Ed.2d 348 (1988). The State also insists that the word "or," found also in Instruction C-10, is a mere scrivener's error which the jury copied into its verdict.
Given the circumstances of this case, there is no way that a reasonable juror who found any of the factors could have failed to find the first factor in the list. Either Ronnie Conner killed Celeste Brown or he did not. The evidence permits no reasonable alternative conclusion. If there exists any error, it is harmless.
The assignment of error lacks merit.

XX.

DID THE INTRODUCTION OF EVIDENCE OF OTHER BAD ACTS DENY CONNER A FAIR TRIAL?
In this assignment or error, relating more to the guilt phase of trial than to the sentencing phase, Conner argues that the trial court erred in admitting evidence of his cocaine use at or around the time of Celeste Brown's death. Specifically, he objects (1) to Vicky Gulley's testimony about his smoking crack cocaine on the night of January 1, 1990, when she visited his apartment, and (2) to the testimony of Detective James Brown concerning the seizure of crack cocaine paraphernalia at Conner's apartment the day after the murder.
Conner contends that the evidence regarding cocaine use was irrelevant and tended to mislead the jurors by diverting their minds from the issue of whether the defendant was innocent or guilty of the crime at bar. See Elmore v. State, 510 So.2d 127, 130 (Miss. 1987); West v. State, 463 So.2d 1048, 1052 (Miss. 1985). He further asserts that the evidence was inadmissible by virtue of M.R.E. Rule 404(b) which governs the admissibility of evidence concerning collateral "bad acts." That rule provides as follows:
(b) Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in *1274 conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent preparation, plan, knowledge, identify, or absence of mistake or accident. [Emphasis added].
Conner's arguments notwithstanding, the evidence at issue is admissible under M.R.E. 404(b). The prosecution did not introduce evidence relating to Conner's cocaine use in order to show bad character. Instead, the prosecution used the evidence to help establish Conner's motive for committing the crime.
During the course of the trial, the prosecution sought to contrast Conner's virtually penniless condition before the crime with his improved financial situation thereafter. Before the crime Frank Blair loaned Conner money with which to buy Thunderbird wine for the two of them to drink; after the crime, Conner asked Vicky Gully if she wanted to get high and later hosted a party where "a lot" of cocaine was smoked. Gulley's testimony concerning Conner's cocaine use thus assisted the State in proving a pecuniary motive for the crime. Detective Brown's testimony about seizing cocaine paraphernalia the next day after the murder at Conner's apartment serves to corroborate Vicky Gully's testimony concerning what happened the night before. Obviously, the testimony about Conner's drug use is genuinely relevant to the core issue of whether Conner committed the crime with which he is charged.
Accordingly, the evidence was not misleading or unfairly prejudicial and the trial court committed no error in this regard.

XXI.

DID THE TRIAL COURT ERR BY ALLOWING THE CROSS-EXAMINATION OF CONNER ON A CRIME HE DID NOT COMMIT?
Conner next argues that the prosecution denied him a fair trial by cross-examining him concerning "a crime about which there is no evidence whatsoever." He refers to the following exchange:
Q. You are a peaceful man; is that right?
A. Yes, sir.
Q. Never done anything to anybody?
A. May have hurt people feelings.
Q. You never tried to hurt anybody?
A. No, sir.
Q. You never possessed any weapons?
A. No, sir.
Q. You never displayed any weapons to anyone?
A. No, sir.
Q. You never been convicted of that?
A. Convicted of what?
Q. Displaying a weapon.
A. No, sir, I don't think so.
Q. A knife in particular?
A. I don't think so.
Q. Do you own a knife?
A. No, sir.
Q. You don't own any knives?
A. No, sir.
Q. You don't have any steak knives at your apartment?
A. No, sir.
Q. Or did have?
A. No, sir.
Q. On January 1st you did not have a steak knife in your apartment?
A. No, sir.
Q. Did you have any sharp knives in your apartment?
A. Butter knives.
If there was no factual basis for the prosecution's implication that Conner had previously been convicted of displaying a knife, the reference may well have constituted reversible error. See Hosford v. State, 525 So.2d 789 (Miss. 1988) (prosecutor's unfounded insinuation that defendant had "fooled with" his stepchildren required reversal). As it stands, however, the issue is waived since Conner did not object at trial. See Cole, 525 So.2d at 369.

*1275 XXII.

DID THE TRIAL COURT ERR IN DENYING DEFENDANT'S MOTION TO COMPEL DISCLOSURE OF INFORMATION REGARDING MITIGATING CIRCUMSTANCES?
Prior to trial, Conner filed a motion to compel disclosure of aggravating circumstances and information relating to mitigating circumstances. The trial judge declined, observing:
With respect to any information relating to mitigating circumstances, the Court has already entered an order that all exculpatory material be turned over to the Defendant. So, since that order has already been granted, this information relating to mitigating circumstances will be denied.
Counsel for defense persisted:
BY MR. WILSON: Your Honor, may I speak for a moment relating to paragraph four, the mitigating circumstances?
BY THE COURT: Yes.
BY MR. WILSON: A lot of these things I am having a great deal of difficulty getting because Ronnie does have a mental problem and he is not able to assist me as to where to go and look for things and ask for things. Most of these things deal with public records that will be a lot easier and more practical for the State to have the information. Being a one man office, it [sic] practically impossible for me to do it. At the guilt phase of the trial, it would be possible that they be required at that time? I don't see any relevancy until we get there anyway.
BY THE COURT: I can't argue with anything that you said, other than I know of no law or case that requires the State to go out and do investigative work and round up mitigating circumstances for the Defendant and I am not going to require them to do that. He can tell you where this information is, his background. But that is not  I don't feel like that burden should be placed on the State.
The trial court was unable to recall any authority requiring the State to gather mitigation evidence, and, judging from the appellant's briefs, defense and appellate counsel could not think of any either. Conner cites several cases dealing with suppression of evidence, none of which have anything to do with the issue at hand. The issue is specious and unworthy of review.

XXIII.

DID THE LIMITATION OF CLOSING ARGUMENT AT THE SENTENCING PHASE OF TRIAL VIOLATE CONNER'S CONSTITUTIONAL RIGHT TO A FAIR TRIAL?
The trial court afforded the defense forty-five minutes at the guilt/innocence phase of the trial and fifteen minutes at the sentencing phase for closing arguments. Citing Willie v. State, 585 So.2d 660 (Miss. 1991), Conner argues that these time constraints unconstitutionally limited the presentation of his case and denied him effective assistance of counsel. See Gray v. State, 351 So.2d 1342 (Miss. 1977); Ray v. State, 330 So.2d 580 (Miss. 1976); Wingo v. State, 62 Miss. 311 (1884) (undue limitation on closing arguments can constitute reversible error).
The appellant in Willie, like Conner, complained on appeal that the trial court had erred in limiting closing arguments in the sentencing phase of his trial to fifteen minutes for each party.
The trial judge asked the parties whether ten minutes would be sufficient time to close for the sentencing phase. Willie responded that he would like at least twenty-five minutes. The judge granted fifteen minutes "to the side." The trial judge later denied that he had limited closing argument to fifteen minutes and stated that he did not believe Willie was serious in his request for additional time. Willie responded by offering to read to the court portions of his closing argument which he never had time to say.
Willie, 585 So.2d at 675.
In its analysis, the Court first observed that
Generally, the amount of time granted for closing argument rests within the sound discretion of the trial judge. [Cites omitted]. This discretion is not absolute, *1276 and we have instructed the lower courts to proceed with caution when limiting the time for closing argument in a criminal trial... .
... A defendant must be allowed, within reason, whatever time he believes is necessary to seek a penalty less than death. Willie's request for twenty-five minutes was within reason.
Despite the limitation, if Willie had sufficient time to give his closing argument, we will not reverse. Cf. Hollins [v. State], 340 So.2d [438] at 441 [(Miss. 1976)]. By offering to read to the trial court portions of his closing argument which he never had time to say, Willie clearly demonstrated that he was prejudiced by not being allowed to make a full and complete closing argument. The trial judge abused his discretion, and because we cannot conclude that Willie's right to be heard was not impaired, we reverse and remand for a new trial on sentencing.
Willie, 585 So.2d at 676.
The instant case is readily distinguishable from Willie. Where Willie demonstrated to the trial court what he would have argued had he been given extra time, Conner made no such proffer. Prior to this appeal, Conner never suggested that he would have argued additional points in closing. This Court would be justified in concluding that Conner, far removed from the scene of trial and given the benefit of twenty-twenty hindsight, has decided that he would argue more loquaciously if he had a chance to do it again.
Of course, as Conner points out in his brief, Willie does not set out a rigid formula for appellants to follow in preserving for appeal the issue of unreasonable time restrictions on closing arguments. Willie does suggest, however, that even a very short time limit does not constitute reversible error unless the defendant suffers prejudice. In the instant case, Conner gave no indication whatsoever at trial that the time limits which the court set were less than adequate. He never raised an objection, he never asked for a longer time in which to argue. Even in his motion for a new trial, he makes no mention of the issue.
Under these circumstances, this Court could not find that the trial judge abused his discretion in limiting closing arguments as he did.

XXIV.

DID THE PROSECUTOR IMPERMISSIBLY ARGUE THAT THE JURY SHOULD CONVICT CONNER AND SENTENCE HIM TO DEATH OUT OF VENGEANCE AND SYMPATHY FOR THE VICTIM IN VIOLATION OF STATE AND FEDERAL LAW?
During closing arguments, the prosecutor portrayed Celeste Brown as a "grandmother" who left home "wearing her mother's day present ring on her finger." When summing up his case, the prosecutor counseled the jury that "[i]n considering justice, I ask you not to forget Celeste Brown, who was the victim in this case, because she deserves justice." Conner characterizes these statements as a "blatant attempt to elicit sympathy for the victim and her family ... [in] violation of state law and the eighth and fourteenth amendments to the federal constitution."
Conner's argument falls flat for two reasons. First, he never objected to the comments at trial and therefore waived them for purposes of appeal. Willie, 585 So.2d at 679; Turner v. State, 573 So.2d 657, 672 (Miss. 1990), cert. denied, 500 U.S. 910, 111 S.Ct. 1695, 114 L.Ed.2d 89 (1991); Shell v. State, 554 So.2d 887, 901 (Miss. 1989), rev'd. on other grounds, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990). Secondly, the United States Supreme Court in Payne v. Tennessee, 501 U.S. 808, ___, 111 S.Ct. 2597, 2606, 115 L.Ed.2d 720, 736 (1991), recently held that the federal constitution does not prohibit the introduction of evidence concerning the background and character of the victim and the impact of the crime on the victim's family. This Court adopted the Payne holding in Hansen v. State, 592 So.2d 114 (1991), cert. denied, ___ U.S. ___, 112 S.Ct. 1970, 118 L.Ed.2d 570 (1992), and noted:
A state may legitimately conclude that evidence about the victim and about the impact of the murder of the victim's family is relevant to the jury's decision as to whether *1277 or not the death penalty should be imposed.
Hansen, 592 So.2d at 146.
The assignment of error is without merit.

XXV.

DOES THE JURY'S FAILURE TO MAKE FINDINGS AS REGARDS TO AGGRAVATING AND MITIGATING CIRCUMSTANCES REQUIRE REVERSAL OF THE DEATH SENTENCE?
Conner seeks reversal since the jury failed to make findings of mitigating circumstances. However, Miss. Code Ann. § 99-19-101(3) requires:
In each case in which the jury imposes the death sentence, the determination of the jury shall be supported by specific written findings of fact based upon the circumstances in subsections (5) and (6) [which define aggravating and mitigating circumstances, respectively] of this section and upon the records of the trial and the sentencing proceedings.
Section 99-19-103, styled "Instructions; aggravating circumstances shall be designated by jury in writing; effect of jury's failure to agree on punishment," provides in part:
The jury, if its verdict be a unanimous recommendation of death, shall designate in writing, signed by the foreman of the jury, the statutory aggravating circumstance or circumstances which it unanimously found beyond a reasonable doubt... .
There is no corresponding provision for a written enumeration of mitigating circumstances.
In the case sub judice, the jury's sentencing verdict reads in part:
Next, we, the jury, find that the aggravating circumstances of: (1) Whether the capital offense was committed while the defendant was engaged in the crime of kidnapping. (2) Whether the capital offense was committed while the defendant was engaged in the crime of robbery. (3) Whether the capital offense was committed for pecuniary gain. (4) Whether the capital offense was especially heinous, atrocious, or cruel. (5) Whether the defendant was previously convicted of a felony involving the use of [sic] threat of violence to the person, are sufficient to impose the death penalty and that there are insufficient mitigating circumstances to outweigh the aggravating circumstances and we unanimously find the defendant should suffer death.
Conner's grievance with this portion of the verdict is twofold. First, he argues that the jury's use of the word "whether" at the beginning of each clause indicates that the jury merely "parroted" the jury instruction and failed to engage in the mandatory fact-finding process. Secondly, he complains that the verdict violates the statutory written-findings requirement by failing to include a list of mitigating circumstances.
Conner doomed this assignment of error before he ever raised it by failing to object to the verdict's form at trial. See Cole, 525 So.2d 365, 369 (Miss. 1987), cert. denied, 488 U.S. 934, 109 S.Ct. 330, 102 L.Ed.2d 348 (1988); Pinkney v. State, 538 So.2d 329, 338 (Miss. 1988), vacated on other grounds, 494 U.S. 1075, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990). But, even if the objection were preserved, it has no merit. No one can reasonably conclude, on grounds that the word "whether" repeatedly appears in the verdict, that the jury did not fulfil its fact-finding duties. The verdict would certainly win no grammar award, but its meaning is perfectly clear. The jury found that all five aggravating circumstances existed and that the aggravating circumstances carried more weight than did mitigating circumstances.
The absence of a list of mitigating circumstances likewise ranks as a non-issue. See Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) ("Nor are we impressed with the claim that without written jury findings concerning mitigating circumstances, appellate courts cannot perform their proper role."). This Court has never read Miss.Code §§ 99-19-101, et seq., as requiring an express written list of all the mitigating circumstances which members of the jury may find extant. Since the law *1278 requires no consensus among the jury members regarding mitigating factors, listing the jury's findings on such factors would often prove impracticable.
The assignment of error is without merit.

XXVI.

DID THE SENTENCING INSTRUCTION IMPERMISSIBLY SHIFT THE BURDEN OF PROOF TO THE DEFENDANT?
At trial, Conner objected to the language in Instruction S-17 which provided in part:
If you find from the evidence that one or more of the preceding elements of mitigation exist, then you must consider whether they outweigh or overcome the aggravating circumstance you previously found. In the event that you find that mitigating circumstances do not outweigh or overcome the aggravating circumstances, then you may impose the death sentence.
He argued then, as now, that a proper instruction would permit imposition of the death penalty only where the jury finds that aggravating circumstances outweigh mitigating circumstances, not vice versa.
This argument was thoroughly weighed and found wanting in Shell v. State, 554 So.2d 887, 904 (Miss. 1989), rev'd. on other grounds, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990); see also Jordan v. State, 365 So.2d 1198, 1206 (Miss. 1978), cert denied, 444 U.S. 885, 100 S.Ct. 175, 62 L.Ed.2d 114 (1979); Gray v. Lucas, 677 F.2d 1086, 1105-06 (Miss. 1986).

XXVII.

DOES THE AGGREGATE ERROR IN THIS CASE REQUIRE REVERSAL OF THE CONVICTION AND DEATH SENTENCE?
"It is true that in capital cases, although no error, standing alone, requires reversal, the aggregate effect of various errors may create such an atmosphere of bias, passion and prejudice that they effectively deny the defendant a fundamentally fair trial." Woodward v. State, 533 So.2d 418, 432 (Miss. 1988), cert. denied, 490 U.S. 1028, 109 S.Ct. 1767, 104 L.Ed.2d 202 (1989); See Stringer v. State, 500 So.2d 928, 939 (Miss. 1986); Williams v. State, 445 So.2d 798, 814 (Miss. 1984), cert. denied, 469 U.S. 1117, 105 S.Ct. 803, 83 L.Ed.2d 795 (1985). In this case, the errors are few and are not of that variety which, harmless in isolation, cumulatively infect a trial with bias and prejudice; therefore, the aggregate error is insufficient to undercut the jury's verdict and sentence.

CONCLUSION
From a thorough review and analysis of the record, we conclude that the trial court did not err in imposing the death sentence. Considering the crime committed, the manner in which it was committed, and the defendant himself, we find that no prejudice, passion or any other whimsical or capricious factors were contemplated by the trial court. The death penalty inflicted upon Conner is consistent with other like cases, and all procedures applied in the sentencing phase were necessary and correct.
The judgment of the circuit court is affirmed and Wednesday, January 19, 1994, is set for the execution of the sentence by the infliction of the death penalty in the manner provided by law.
CONVICTION FOR CAPITAL MURDER AND SENTENCE TO DEATH BY LETHAL INJECTION AFFIRMED. WEDNESDAY, JANUARY 19, 1994, SET FOR INFLICTION OF THE DEATH PENALTY AS PROVIDED BY LAW.
As to guilt phase: HAWKINS, C.J., DAN M. LEE, PRATHER, P.JJ., and SULLIVAN, PITTMAN, BANKS, ROBERTS and SMITH, JJ., concur.
As to sentencing phase: DAN M. LEE, P.J., and PITTMAN, ROBERTS and SMITH, JJ., concur.
HAWKINS, C.J., dissents to part XIV with separate written opinion joined by PRATHER, P.J., and SULLIVAN and BANKS, JJ.

*1279 APPENDIX

DEATH CASES AFFIRMED BY THIS COURT

Hansen v. State, 592 So.2d 114 (Miss. 1991).
[*]Shell v. State, 554 So.2d 887 (Miss. 1989), Shell v. Mississippi, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990) reversing, in part, and remanding, Shell v. State, 595 So.2d 1323 (Miss. 1992) remanding for new sentencing hearing.
Davis v. State, 551 So.2d 165 (Miss. 1989).
Minnick v. State, 551 So.2d 77 (Miss. 1989).
[*]Pinkney v. State, 538 So.2d 329 (Miss. 1989), Pinkney v. Mississippi, 494 U.S. 1075, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990) vacating and remanding, Pinkney v. State, 602 So.2d 1177 (Miss. 1992) remanding for new sentencing hearing.
[*]Clemons v. State, 535 So.2d 1354 (Miss. 1988), Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) vacating and remanding, Clemons v. State, 593 So.2d 1004 (Miss. 1992) remanding for new sentencing hearing.
Woodward v. State, 533 So.2d 418 (Miss. 1988).
Nixon v. State, 533 So.2d 1078 (Miss. 1987).
Cole v. State, 525 So.2d 365 (Miss. 1987).
Lockett v. State, 517 So.2d 1346 (Miss. 1987).
Lockett v. State, 517 So.2d 1317 (Miss. 1987).
Faraga v. State, 514 So.2d 295 (Miss. 1987).
[*]Jones v. State, 517 So.2d 1295 (Miss. 1987), Jones v. Mississippi, 487 U.S. 1230, 108 S.Ct. 2891, 101 L.Ed.2d 925 (1988) vacating and remanding, Jones v. State, 602 So.2d 1170 (Miss. 1992) remanding for new sentencing hearing.
Wiley v. State, 484 So.2d 339 (Miss. 1986).
Johnson v. State, 477 So.2d 196 (Miss. 1985).
Gray v. State, 472 So.2d 409 (Miss. 1985).
Cabello v. State, 471 So.2d 332 (Miss. 1985).
Jordan v. State, 464 So.2d 475 (Miss. 1985).
Wilcher v. State, 455 So.2d 727 (Miss. 1984).
Billiot v. State, 454 So.2d 445 (Miss. 1984).
Stringer v. State, 454 So.2d 468 (Miss. 1984).
Dufour v. State, 453 So.2d 337 (Miss. 1984).
Neal v. State, 451 So.2d 743 (Miss. 1984).
Booker v. State, 449 So.2d 209 (Miss. 1984).
Wilcher v. State, 448 So.2d 927 (Miss. 1984).
Caldwell v. State, 443 So.2d 806 (Miss. 1983).
Irving v. State, 441 So.2d 846 (Miss. 1983).
Tokman v. State, 435 So.2d 664 (Miss. 1983).
Leatherwood v. State, 435 So.2d 645 (Miss. 1983).
Hill v. State, 432 So.2d 427 (Miss. 1983).
Pruett v. State, 431 So.2d 1101 (Miss. 1983).
Gilliard v. State, 428 So.2d 576 (Miss. 1983).
Evans v. State, 422 So.2d 737 (Miss. 1982).
King v. State, 421 So.2d 1009 (Miss. 1982).
Wheat v. State, 420 So.2d 229 (Miss. 1982).
Smith v. State, 419 So.2d 563 (Miss. 1982).
Johnson v. State, 416 So.2d 383 (Miss. 1982).
Edwards v. State, 413 So.2d 1007 (Miss. 1982).
Bullock v. State, 391 So.2d 601 (Miss. 1980).
Reddix v. State, 381 So.2d 999 (Miss. 1980).
Jones v. State, 381 So.2d 983 (Miss. 1980).
Culberson v. State, 379 So.2d 499 (Miss. 1979).
Gray v. State, 375 So.2d 994 (Miss. 1979).
Jordan v. State, 365 So.2d 1198 (Miss. 1978).
Voyles v. State, 362 So.2d 1236 (Miss. 1978).
Irving v. State, 361 So.2d 1360 (Miss. 1978).
Washington v. State, 361 So.2d 61 (Miss. 1978).
Bell v. State, 360 So.2d 1206 (Miss. 1978).

DEATH CASES REVERSED AS TO GUILT PHASE AND SENTENCE PHASE

Butler v. State, 608 So.2d 314 (Miss. 1992).
Jenkins v. State, 607 So.2d 1171 (Miss. 1992).
*1280 Abram v. State, 606 So.2d 1015 (Miss. 1992).
Balfour v. State, 598 So.2d 731 (Miss. 1992).
Griffin v. State, 557 So.2d 542 (Miss. 1990).
Bevill v. State, 556 So.2d 699 (Miss. 1990).
West v. State, 553 So.2d 8 (Miss. 1989).
Leatherwood v. State, 548 So.2d 389 (Miss. 1989).
Mease v. State, 539 So.2d 1324 (Miss. 1989).
Houston v. State, 531 So.2d 598 (Miss. 1988).
West v. State, 519 So.2d 418 (Miss. 1988).
Davis v. State, 512 So.2d 1291 (Miss. 1987).
Williamson v. State, 512 So.2d 868 (Miss. 1987).
Foster v. State, 508 So.2d 1111 (Miss. 1987).
Smith v. State, 499 So.2d 750 (Miss. 1986).
West v. State, 485 So.2d 681 (Miss. 1985).
Fisher v. State, 481 So.2d 203 (Miss. 1985).
Johnson v. State, 476 So.2d 1195 (Miss. 1985).
Fuselier v. State, 468 So.2d 45 (Miss. 1985).
West v. State, 463 So.2d 1048 (Miss. 1985).
Jones v. State, 461 So.2d 686 (Miss. 1984).
Moffett v. State, 456 So.2d 714 (Miss. 1984).
Lanier v. State, 450 So.2d 69 (Miss. 1984).
Laney v. State, 421 So.2d 1216 (Miss. 1982).

DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR RESENTENCING TO LIFE IMPRISONMENT

Reddix v. State, 547 So.2d 792 (Miss. 1989).
Wheeler v. State, 536 So.2d 1341 (Miss. 1988).
White v. State, 532 So.2d 1207 (Miss. 1988).
Bullock v. State, 525 So.2d 764 (Miss. 1987).
Edwards v. State, 441 So.2d 84 (Miss. 1983).
Dycus v. State, 440 So.2d 246 (Miss. 1983).
Coleman v. State, 378 So.2d 640 (Miss. 1979).

DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR A NEW TRIAL ON SENTENCING PHASE ONLY

[*]Shell v. State, 554 So.2d 887 (Miss. 1989), Shell v. Mississippi, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990) reversing, in part, and remanding, Shell v. State 595 So.2d 1323 (Miss. 1992) remanding for new sentencing hearing.

[*]Pinkney v. State, 538 So.2d 329 (Miss. 1989), Pinkney v. Mississippi, 494 U.S. 1075, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990) vacating and remanding, Pinkney v. State, 602 So.2d 1177 (Miss. 1992) remanding for new sentencing hearing.
[*]Clemons v. State, 535 So.2d 1354 (Miss. 1988), Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) vacating and remanding, Clemons v. State, 593 So.2d 1004 (Miss. 1992) remanding for new sentencing hearing.
[*]Jones v. State, 517 So.2d 1295 (Miss. 1987), Jones v. Mississippi, 487 U.S. 1230, 108 S.Ct. 2891, 101 L.Ed.2d 925 (1988) vacating and remanding, Jones v. State, 602 So.2d 1170 (Miss. 1992) remanding for new sentencing hearing.
Russell v. State, 607 So.2d 1107 (Miss. 1992).
Holland v. State, 587 So.2d 848 (Miss. 1991).
Willie v. State, 585 So.2d 660 (Miss. 1991).
Ladner v. State, 584 So.2d 743 (Miss. 1991).
Mackbee v. State, 575 So.2d 16 (Miss. 1990).
Berry v. State, 575 So.2d 1 (Miss. 1990).
Turner v. State, 573 So.2d 657 (Miss. 1990).
State v. Tokman, 564 So.2d 1339 (Miss. 1990).
Johnson v. State, 547 So.2d 59 (Miss. 1989).
Williams v. State, 544 So.2d 782 (Miss. 1989).
Lanier v. State, 533 So.2d 473 (Miss. 1988).
Stringer v. State, 500 So.2d 928 (Miss. 1986).
Pinkton v. State, 481 So.2d 306 (Miss. 1985).
Mhoon v. State, 464 So.2d 77 (Miss. 1985).
*1281 Cannaday v. State, 455 So.2d 713 (Miss. 1984).
Wiley v. State, 449 So.2d 756 (Miss. 1984).
Williams v. State, 445 So.2d 798 (Miss. 1984).
HAWKINS, Chief Justice, dissenting as to part XIV:
I respectfully dissent on the exclusion of mitigation testimony of Dorothy Conner.
In the sentencing phase, the first witness called for the defense was Conner's sister, Dorothy, thirty-two years of age and one year older than Conner. She testified that Conner had for many years been going to the Weems Mental Health Clinic, and that he "hears voices when he gets off his medication. He hears voices and gets nervous and he just don't feel normal."
Defense counsel proceeded:
Q. Could you give us some examples of when he heard voices?
A. One time he was on the train 
BY MR. ANGERO:
Your Honor, we object to testimony that would be hearsay in nature unless this witness was present or in some other way substantiates this testimony. We object to it, it would be hearsay.
BY MR. WILSON:
I will rephrase my question.
Q. Dorothy, would you tell us some things that you have personally observed and heard involving Ronnie hearing voices?
A. Yes, I can. He had a broken collar bone. He was on a train and he jumped off.
BY MR. ANGERO:
Excuse me, Your Honor. I don't know where this is going, but it doesn't appear to me that she is even establishing she was on the train. I don't know where it is going, but I object to hearsay.
BY THE COURT:
I will sustain the objection until the proper predicate is laid.
Q. Has Ronnie made any statement to you about hearing voices?
A. Yes, he has.
BY MR. ANGERO:
Your Honor, that is hearsay. That is what we object to. His statement that he heard voices is hearsay.
BY THE COURT:
I will sustain the objection. The witness will be allowed to testify to what she has personally observed.
(R. 641-642)
On appeal Conner assigns the exclusion of this testimony as error.
The record reveals that Conner had been diagnosed as a schizophrenic.[1] One of the classic symptoms of schizophrenia is hearing voices. Dorland's Medical Dictionary gives the following definitions:
Schizophrenia. Any of a group of severe emotional disorders, usually of psychotic proportions, characterized by misinterpretation and retreat from reality, delusions, hallucinations, ... and withdrawn, bizarre, or regressive behavior.
Paranoid schizophrenia, a psychotic state characterized by delusions of grandeur or persecution, often accompanied by hallucinations.
The Encyclopedia Brittanica states:
Schizophrenia, a term used by psychiatrists for a group of severe mental disorders that generally have in common disturbances of feeling, thought, and relations to the outside world.
4. The paranoid type, which usually arises later in life than the other types, is characterized primarily by unrealistic, illogical thinking, with delusions of persecution or of grandeur, and is often accompanied by hallucinations.
Hallucinations, although not invariably present, are a conspicuous symptom in the hebephrenic and paranoid types. The *1282 most common are auditory: the patient hears voices and believes in their reality.
The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 2d Ed. 1968 (DSM-2), defines the diseases as follows:
(1) Psychosis
a. Schizophrenia
... .
This large category includes a group of disorders and manifested by characteristic disturbances of thinking, mood and behavior. Disturbances in thinking are marked by alterations of concept formation which may lead to misinterpretation of reality and sometimes to delusions and hallucinations,
... .
Schizophrenia, paranoid type
This type of schizophrenia is characterized primarily by the presence of persecutory or grandiose delusions, often associated with hallucinations. Excessive religiosity is sometimes seen. The patient's attitude is frequently hostile and aggressive, and his behavior tends to be consistent with his delusions.
Alexander D. Brooks in his book Law, Psychiatry and the Mental Health System, makes the following observations about a paranoid schizophrenic:
The paranoid schizophrenic may suffer from a belief that he is under hostile scrutiny or influence of others, such as the FBI or CIA, or under the control of some malevolent extraterrestrial or highly refined technological device such as a Martian communication system or radar. A familiar delusion is that one is observed by the "evil eye." [citations omitted] Paranoid schizophrenics characteristically receive "messages" on the radio or television, from a radiator, or in dreams.
... .
At an advanced stage of his illness the paranoid schizophrenic may abandon external events and base his delusion entirely on a hallucinated event... .
The hostility and aggression of the paranoid schizophrenic may find expression in criminal activity, giving rise to the notion that he is dangerous.
See also Gill v. State, 488 So.2d 801 (Miss. 1986).
Mississippi Rules of Evidence (MRE) 801 defines hearsay:
The following definitions apply under this article:
(a) Statement. A "statement" is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by him as an assertion.
(b) Declarant. A "declarant" is a person who makes a statement.
(c) Hearsay. "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.
Dorothy's testimony as to observing Conner when he was "hearing voices" was not hearsay, but describing behavior she observed firsthand. It was relevant and had a material bearing upon whether Conner "was under the influence of extreme mental or emotional disturbance," at the time of the commission of the crime. Miss. Code Ann. § 99-19-101(6)(b) (Supp. 1990).
Excluding this testimony from consideration by the jury was error.
Moreover, it has always been the rule of evidence in this State that lay witnesses may express opinions as to a person's insanity, but only after giving specific examples of what they have observed. See, e.g., Groseclose v. State, 440 So.2d 297 (Miss. 1983); Harvey v. State, 207 So.2d 108 (Miss. 1968); McGarrh v. State, 249 Miss. 247, 148 So.2d 494 (1963); Keeler v. State, 226 Miss. 199, 84 So.2d 153 (1956). See also Miss.R.Evid. 701. Just as a witness may testify from observing bizarre behavior that it exemplifies conduct of an insane person, a jury can make the same evaluation.
The final paragraph of the majority rejecting this assignment of error has the following commentary:
The testimony of Dorothy Conner, as presented, would have not presented a mitigating circumstance in the sentencing *1283 hearing, as it had nothing to do with Conner's condition at the time of the murder. We cannot say that, although someone may be schizophrenic, yet knows right from wrong, he cannot be put to death. His mental condition was determined prior to trial when the doctors stated that he knew the difference between right and wrong and could assist counsel in the preparation of his defense.
Majority Opinion at 1248.
It was, of course, a matter for the jury to determine whether Dorothy's testimony about Conner's strange behavior, classic symptoms of the psychosis of schizophrenia, indicated that he was a person under "extreme mental disturbance" as provided by Miss. Code Ann. § 99-19-101(6). The jury was deprived of this testimony. The basis for the majority's categorical statement that "it had nothing to do with Conner's condition at the time of the murder," escapes me. Does schizophrenia come and go?
The majority continues that simply because there has been medical testimony that a man passes the M'Naghten test of knowing the difference between "right and wrong," and it has been determined that he has the competence, barely, to stand trial, that a jury is not entitled to hear testimony, in determining whether he should be put to death or sentenced to life imprisonment, that the prisoner has a serious mental illness as evidenced by extraordinarily strange behavior. I was unaware the first two tests eliminated the accused's right to have the jury consider "whether he was under the influence of extreme mental or emotional disturbance." Miss. Code Ann. § 99-19-101(6)(b) (Supp. 1990).
The "voices" he was hearing were part and parcel of his behavior which she was asked to describe, and vital to the jury in making an informed determination as to whether Conner was laboring under a mental disturbance. Such testimony took on critical importance when being placed before a jury which had the awesome responsibility of deciding whether or not Conner would be sentenced to death.
Dorothy should have been permitted to testify to what she heard her brother say he was hearing, and the jury to determine from this whether Conner was under any mental disturbances and its extent.
It was reversible error to deprive the jury of this evidence. Therefore, I respectfully dissent.
PRATHER, P.J., and SULLIVAN and BANKS, JJ., join this opinion.
NOTES
[1] Specifically, the ABA standards embody the following criteria:

1. Defendants should have a perception of the process not distorted by mental illness or disability. Whether phrased in terms of a) an ability to perceive rationally and without distortion, b) an "understanding" of the process, or c) an "awareness" of the charge and possible verdicts, or d) couched in a codified requirement that defendants understand that there is a judge on the bench, who will defend against criminal charges, the thrust of the requirement is that defendants understand the nature of the process and their functions as participants within that process free from undue perceptual distortion.
2. Defendants require a capacity to maintain the attorney-client relationship, embracing an ability to discuss the facts of a case with counsel "without paranoid distrust," to advise and accept advice from counsel rationally about a pending case which is something more than a superficial capacity to converse with others.
3. A third requirement ... bears on the ability to recall and relate factual information. If a primary purpose of the prohibition against trying incompetent defendants is to preserve accuracy in factfinding, then defendants must be able to recall and relate factual occurrences. If they are not, they cannot reveal exonerating circumstances to their attorneys. This requirement has been variously phrased: that a defendant have "sufficient memory to relate answers to questions posed: to him or her, that "he can follow the testimony reasonably well," and there be a "capacity to realistically challenge prosecution witnesses." Without that capacity, defendants realistically are unable to exercise the rights to consult with counsel, testify in personal defense, and confront accusers.
4. Defendants should be capable of testifying in personal defense if that should prove appropriate.
5. A final factor is a defendant's abilities to meet the competency criteria in the setting of the particular charges, the extent of the defendant's participation in trial proceedings, and the complexity of the case. Therefore, an evaluator should consider a defendant's mental ability in relation to the severity of the charge and the complexity of the case.
Commentary to ABA Criminal Mental Health Standards 7-4.1 at 174-75.
[*] Case was originally affirmed in this Court but on remand from U.S. Supreme Court, case was remanded by this Court for a new sentencing hearing.
[1] The May 1, 1990, report of Margie Lancaster, M.D., of the Mississippi State Hospital, to the circuit judge notes that the Mental Health Center had for a number of years diagnosed Conner as a schizophrenic, and the hospital had "retained this diagnosis."